**CWT FARMS, INC. and CWT International, Inc., Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 84–8012.**

United States Court of Appeals, Eleventh Circuit.

March 19, 1985.

W. Woodrow Stewart, Steven A. Cornelison, Gainesville, Ga., for petitioners-appellants.

Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, David English Carmack, Tax Division, U.S. Dept. of Justice, Washington, D.C., for respondent-appellee.

Before HENDERSON and HATCHETT, Circuit Judges, and NICHOLS *, Senior Circuit Judge.

* Honorable Philip Nichols, Jr., U.S. Circuit Judge for the Federal Circuit, sitting by designation.

HATCHETT, Circuit Judge:

In this case, we affirm the United States Tax Court's, 79 T.C. 86, determination that CWT International, Inc. did not qualify for tax treatment as a domestic international sales corporation.

CWT Farms, Inc. (Farms) and CWT International (International) are Georgia corporations with their principal places of business in Gainesville, Georgia. Twin Oaks Hatchery, Inc. (Twin Oaks), a domestic poultry producer, organized Farms in 1958 as a sales outlet for its excess broiler chickens for export to the Caribbean and Central and South America. International is the wholly-owned subsidiary of Farms. Farms created International as a commission agent for its export sales to take advantage of the tax savings provided for domestic international sales corporations (DISC). The election to treat International as a DISC was filed on September 7, 1972. Twin Oaks also owns Helen Feed Store, Inc. (Helen Feed).

During the years in question, 1975, 1976, and 1977, Farms paid International commissions earned by International as a commission agent DISC.[1] From 1974 to 1976, International made three loans to Farms: each loan was evidenced by a *demand* promissory note. Although the notes were not identified as "producer's loans," the books and records of International placed each of these loans under the heading "producer's loans."[2] Each of the notes was

1.

| Year | Amount | Date Paid | # of Days After End of Fiscal Year |
|---|---|---|---|
| 9/30/75 | $157,538.33 | 12/15/75 | 76 |
| 9/30/76 | 145,440.77 | 12/8/76 | 69 |
| 9/30/77 | 116,142.53 | 12/20/77 | 81 |

Both Farms and International kept their books under an accrual method; commissions, therefore, owed by Farms to International became fixed as of the end of the fiscal year, September 30.

2. Title 26 U.S.C.A. § 993 provides in relevant part:

§ 993. Definitions

(a)(3) Definition of controlled group.—For purposes of this part, the term "controlled group" has the meaning assigned to such term by section 1563(a) . . . .

(b) Qualified export assets.—For purposes of this part, the qualified export assets of a corporation are—

(1) export property . . . ;

(2) assets used primarily in connection with the sale, lease. rental, storage, handling, transportation, packaging, assembly, or servicing of export property, or the performance of engineering or architectural services . . . or managerial services in furtherance of the production of qualified export receipts . . . ;

(3) accounts receivable and evidences of indebtedness which arise by reason of transactions of such corporation. . . .

. . . .

(d) Producer's loans.—

(1) . . . An obligation . . . shall be treated as arising out of a producer's loan if—

(A) the loan, when added to the unpaid balance of all other producer's loans made by the DISC, does not exceed the accumulated DISC income at the beginning of the month in which the loan is made;

(B) the obligation is evidenced by a note . . . with a stated maturity date not more than 5 years from the date of the loan;

(C) the loan is made to a person engaged in the United States in the manufacturing, production, growing, or extraction of export property . . .

(D) at the time of such loan it is designated as a producer's loan.

(2) Limitation.—An obligation shall be treated as arising out of a producer's loan only to the extent that such loan, when added to the unpaid balance of all other producer's loans to the borrower outstanding at the time such loan is made, does not exceed an amount determined by multiplying the sum of—

(A) the amount of the borrower's adjusted basis determined at the beginning of the borrower's taxable year in which the loan is made, in plant, machinery, and equipment, and supporting production facilities in the United States;

(B) the amount of the borrower's property held primarily for sale, lease, or rental, to customers in the ordinary course of trade or business, at the beginning of such taxable year; and

(C) the aggregate amount of the borrower's research and experimental expenditures . . . in the United States during all preceding taxable years beginning after December 31, 1971,

by the percentage which the borrower's receipts, during the 3 taxable years immediately preceding the taxable year . . . in which the loan is made . . . is of the gross receipts during such 3 taxable years from the sale, lease, or rental of property held by such borrower primarily for sale, lease, or

renewed within five years of making of the loans, and each renewal note had a fixed, stated maturity date.[3] Further, the renewal notes of December 1, 1979, and September 1, 1981, stated that they were producer's loans.

In determining the maximum statutory amounts that International could lend to Farms as producer's loans, Farms aggregated its export-related assets with those of Helen Feed and Twin Oaks.[4] Included in this aggregation was an expenditure of $90,377.44 incurred by Twin Oaks for research and experimental costs connected with its ISA VEDETTE flocks in 1976. Farms did not file written statements electing to aggregate the export related assets of its controlled group with International's tax returns for the years 1975, 1976, and

1977. In November, 1978, however, Farms gave the election statements to the revenue agent examining Farms's returns.

On May 28, 1980, the Commissioner filed a Notice of Deficiency determining that International was not a qualified DISC for the taxable years 1975, 1976, and 1977, because it failed to satisfy the qualified export assets test of 26 U.S.C.A. § 992(a)(1)(B) (1982).[5] This determination was based on the findings that International's loans to Farms were not producer's loans under 26 U.S.C.A. § 993(d) (1982), and that the commissions receivable that Farms owed International were not qualified export assets because they were not paid in a timely manner pursuant to Treas. Reg. §§ 1.993–2(d)(2) and 1.994–1(e)(3)(i).[6]

rental to customers in the ordinary course of the trade or business of such borrower. (3) ... An obligation shall be treated as arising out of a producer's loan in a taxable year only to the extent that such loan, when added to the unpaid balance of all other producer's loans to the borrower made during such taxable year, does not exceed an amount equal to—
(A) the amount by which the sum of the adjusted basis of assets ... on the last day of the taxable year in which the loan is made exceeds the sum of the adjusted basis of such assets on the first day of such taxable year; plus
(B) the aggregate amount of the borrower's research and experimental expenditures ... in the United States during such taxable year.
....
(f) Gross receipts.—For purposes of this part, the term "gross receipts" means the total receipts from the sale, lease, or rental of property held primarily for sale, lease, or rental in the ordinary course of trade or business, and gross income from all other sources. In the case of commissions on the sale, lease, or rental of property, the amount taken into account for purposes of this part as gross receipts shall be the gross receipts on the sale, lease, or rental of the property on which such commission arose.

3. Execution
Date of

| Demand Notes | 12/15/74 | 12/15/75 | 12/15/76 |
|---|---|---|---|
| Amount | $66,873.22 | $79,134.16 | $72,000.00 |
| Date of Renewal Note | 12/1/79 | 12/1/80 | 9/1/81 |
| Maturity Date of Renewed Note | 12/1/84 | 12/1/85 | 8/31/86 |

4. *See* 26 U.S.C.A. § 993(a)(3) (providing for the aggregation of export related assets of a control group) at n. 2.

5. Title 26 U.S.C.A. § 992 provides in relevant part:
§ 992. Requirements of a domestic international sales corporation
(a) Definition of "DISC" and "former DISC".—
(1) DISC.—For purposes of this title, the term "DISC" means ... a corporation which ... satisfies the following conditions for the taxable year:
(A) 95 percent or more of the gross receipts ... of such corporation consist of qualified export receipts ...
(B) the adjusted basis of the qualified export assets ... of the corporation at the close of the taxable year equals or exceeds 95 percent of the sum of the adjusted basis of all assets of the corporation at the close of the taxable year,
(C) such corporation does not have more than one class of stock and the par or stated value of its outstanding stock is at least $2,500 on each day of the taxable year, and
(D) the corporation has made an election pursuant to subsection (b) to be treated as a DISC and such election is in effect for the taxable year.

6. Treas.Reg. § 1.993–2(d)(2) provides in relevant part:
If a DISC acts as commission agent for a principal in a transaction ... which results in qualified export receipts for the DISC, and if an account receivable ... held by the DISC and representing the commission payable to the DISC as a result of the transaction arises

As a result of these findings, International was disqualified as a DISC for the taxable years 1975, 1976, and 1977.[7] Farms and International each filed a petition for redetermination of deficiencies in federal corporate income taxes in the United States Tax Court. On July 19, 1982, the Tax Court ruled against them, finding that the demand notes, even as renewed, were not producer's loans. Consequently, International did not qualify as a DISC because 95 percent of its assets were not qualified export assets. The Tax Court, therefore, found it unnecessary to determine whether any of the other requirements for DISC qualification were met. Farms and International, however, filed a motion for reconsideration asking for a determination of whether the commissions receivable due International were qualified export assets. Under the statutes and regulations, International could qualify as a DISC if Farms made a "deficiency distribution to its shareholders in an amount equal to the fair market value of those assets which are not qualified export assets." 26 U.S.C.A. § 992(c)(1) (1982). The Tax Court granted the motion for reconsideration and held tht the commissions receivable were not qualified export assets because they were not paid within sixty days after close of the taxable year as required by Treas.Reg. §§ 1.993–2(d)(2) and 1.994–1(e)(3)(i).

Farms and International appeal. They contend (1) that they complied or substantially complied with the provisions of 26 U.S.C.A. § 993(d)(1)(B) relating to producer's loans, and (2) that Treas.Reg. §§ 1.993–2(d)(2) and 1.994–1(e)(3) are invalid as (a) conditions added to an unambiguous statute, (b) devoid of legislative authority, (c) contradictory of 26 U.S.C.A.

§ 992(a)(1)(B), (d) invalidly retroactive, and (e) unreasonable.

## DOMESTIC INTERNATIONAL SALES CORPORATIONS (DISC)

Congress enacted DISC legislation in 1971 to provide tax incentives for United States firms to increase their exports.

This is important not only because of its stimulative effect but also to remove a present disadvantage of U.S. companies engaged in export activities through domestic corporations. Presently, they are treated less favorably than those which manufacture abroad through the use of foreign subsidiary corporations. United States corporations engaging in export activities are taxed currently on their foreign earnings at the full U.S. corporate income tax rate regardless of whether these earnings are kept abroad or repatriated. In contrast, U.S. corporations which produce and sell abroad through foreign subsidiaries generally can postpone payment of U.S. tax on these foreign earnings so long as they are kept abroad.

H.R.Rep. No. 533, 92d Cong., 1st Sess. ——, *reprinted in* 1971 U.S.Code Cong. & Ad. News 1825, 1872. A corporation which qualifies as a DISC is not taxable on its profits. Further, the shareholders are only taxable currently on a portion of such profits, the other portion being tax deferred until withdrawn from the DISC or until the corporation ceases to qualify as a DISC. The statutory provisions establishing the DISC scheme are set out at 26 U.S.C.A. §§ 991–997 (1982).

## PRODUCER'S LOANS

Of the five qualifying factors for a DISC, the factor relating to "qualified ex-

---

... such account receivable ... shall be treated as a ... [qualified export asset]. *If, however, the principal is a related supplier ... with respect to the DISC, such account receivable ... will not be treated as a ... [qualified export asset] unless it is payable and paid in a time and manner which satisfy the requirements of § 1.994–1(e)(3) ....* [Emphasis added.]

Section 1.994–1(e)(3)(i) provides, in relevant part:

The amount of ... a *sales commission* (or reasonable estimate thereof) actually charged by a DISC to a related supplier ... *must be paid no later than 60 days following the close of the taxable year of the DISC during which the transaction occurred.* [Emphasis added.]

7. The deficiencies for the tax year ending September 30, 1975, were determined to be $173.91, for September 30, 1976, $24,624.41, and for September 30, 1977, $28,965.84.

port assets" is brought into question in this case. The qualified export assets test requires that 95 percent of the adjusted assets of the corporation (the DISC) must be "qualified export assets" for the taxable year. Qualified export assets may include a variety of assets including inventory facilities, accounts receivable, and producer's loans to the parent corporation. A loan is a producer's loan, and thus an asset, if it satisfies 26 U.S.C.A. § 993(d) and Treas. Reg. § 1.993–4(a)(4).[8]

Farms and International contend that they have complied with both the statutes and the regulations relating to producer's loans. They contend that a "stated maturity date not more than 5 years from the date of the loan," 26 U.S.C.A. § 993(d)(1)(B), in a demand note is either the date of demand or the date the note is executed, if the loan is paid within five years. They argue that such a reading of the stated maturity date language is consistent with the purpose of the five-year maturity date requirement. This purpose, they argue, is to test the loans to determine whether they are qualified producer's loans under the borrower's limitation of 26 U.S.C.A. § 993(d)(2) and under the increased investment limitation of 26 U.S. C.A. § 993(d)(3). They further argue that the demand notes in this case comply with the statutory purpose: by renewing the notes within the five-year period, all three notes were subjected to a retesting under the borrower's limitation and increased investment requirements under the procedures established in Treas.Reg. § 1.993–4(d).[9] Alternatively, Farms and International contend that *substantial compliance* is the necessary threshold for satisfaction of the DISC requirements; they argue that they have substantially complied.

**8.** Treas.Reg. § 1.993–4(a)(4) reads in relevant part:

(4) *Evidence and terms of obligation.* A loan is a producer's loan only if the loan is evidenced by a note or other evidence of indebtedness which is made by the borrower and which has a stated maturity date not more than 5 years from the date the loan is made. Accordingly, a loan which does not have a stated maturity date or which has a stated maturity date more than 5 years from the date such loan is made can never meet the 5-year requirement of this subparagraph. Thus, for example, even if there is a period of less than 5 years remaining to the stated maturity date of a loan, the loan can never be a producer's loan if it had a stated maturity date more than 5 years from the date it was made. For a further example, if a loan having a period remaining to maturity of 2 years is extended for a further period of 3 years (making a total of 5 years to maturity from the date of the extension), the extension of the loan would under subparagraph (2)(v) of this paragraph constitute the making of a new producer's loan and the original producer's loan would terminate. If, however, a loan having a period remaining to maturity of 2 years is extended for a further period of 4 years (making a total of 6 years to maturity from the date of the extension), the original producer's loan will terminate and the new loan will not be a producer's loan. If a producer's loan is not paid in full at its maturity date and is not formally refinanced, renewed, or extended, such loan shall be deemed to be a new loan which does not have a stated maturity date and, thus, will not be a producer's loan.

**9.** Treas.Reg. § 1.993–4(d) reads in relevant part:

(d) *Proof of borrower's compliance with paragraphs (b) and (c) of this section.* For purposes of paragraphs (b) and (c) of this section [providing for the borrower's and increased investment limitations], a DISC shall be prepared to establish initially the compliance of the borrower with the requirements of such paragraphs by providing the written statement of the borrower, certified by a certified public accountant, stating that the borrower has complied with the limitation and increased investment requirement in section 993(d)(2) and (3) of the Internal Revenue Code of 1954. In lieu of certification by a certified public accountant, the DISC may attach to its return a statement signed by the borrower under penalties of perjury on a form provided by the Internal Revenue Service certifying that the borrower has complied with the limitation and increased investment requirement in section 993(d)(2) and (3) of the Internal Revenue Code of 1954.... Additional full substantiation of the borrower's compliance with the requirements of such paragraphs may be required by the district director. If full substantiation of such compliance is not provided by the DISC (or the borrower) when required, the loan shall be deemed not to be a producer's loan.

Farms and International also argue that the renewals were the same as paying the loans.

The Tax Court held (1) that when International accepted the demand notes as evidence of its loans to Farms, the loans did not qualify as producer's loans at the time they were made, (2) the loans could not at renewal be qualified as producer's loans, and (3), therefore, International was not a qualified DISC. As authority, the Tax Court cites the plain meaning of section 993(d)(1)(B) and the legislative history of the DISC statutes.

The plain meaning of 26 U.S.C.A. § 993(d)(1) is clear: A loan evidenced by a note must have a stated maturity date of not more than five years from the date of the execution of the loan, and such loan must be designated as a producer's loan in order to qualify as a producer's loan and as a qualified export asset. Farms and International's argument that they have complied with this provision has no factual basis. While the loans made to Farms and International were identified in the books of International as producer's loans, they neither had a stated maturity date of not more than five years from the date of the loan, nor were they designated as producer's loans on the face of the notes.

Farms and International argue further, however, that they have substantially complied with the requirements for qualification of producer's loans. The substantial compliance, they reason, is achieved through execution of the loans consistent with Congress's purpose in enacting the producer's loans provisions. This purpose, they assert, is to retest the loans every five years to determine whether they satisfy the borrower's limitations and increased investment limitations as to producer's loans.

▇▇ While we agree that this is one purpose for enactment of the producer's loan requirements, an even more important purpose was assuring that the profits of the DISC were used exclusively for export production and were not syphoned off to benefit domestic production. Critics of the DISC proposal were disturbed that DISC funds might be allocated "entirely to domestic production or ... entirely to manufacturing activities overseas." Hearings before the Committee on Finance on the Revenue Act of 1971, 92d Cong., 1st Sess. —— (Part 2) at 733–34 (1971) (Statement of Stanley S. Surrey). *See* House Hearings Before the Committee on Ways and Means on Tax Proposals Contained in the President's New Economic Program, 92d Cong., 1st Sess. —— (Part 2) at 507 (1971) (Statement of Rep. Henry S. Reuss). The original conception of producer's loans allowed "exporting subsidiaries to lend their retained profits to parent corporations without any time limit and few other restrictions." *See also* House Hearings Before the Committee on Ways and Means on Tax Proposals Contained in the President's New Economic Program, 92d Cong., 1st Sess. —— (Part 2) at 634 (1971) (Statement of Ralph Nader). Section 993(d)(1), drafted in such detail, accommodates these criticisms in its imposition of particular formalities in the qualification of producer's loans. Section 993(d)(1) communicates the purpose of ensuring that DISC income is used for export production: first, loan transactions between the DISC and the parent must show both in form and in fact that the loan is to be used for export production; second, the loan must be paid back within five years; and third, if not paid back, the loan is disqualified retroactively as a producer's loan or if extended or renewed, the loan must satisfy the formalities of form and substance of producer's loans at that time.[10] We hold, therefore, that the de-

---

10. The House report accompanying the DISC legislation states that "if a loan ... is not collected by the DISC when it matures or is extended at maturity for a period which does not have a fixed time limit, the loan is to cease to qualify as a producer's loan at its original maturity." H.R. Rep. No. 533, 92d Cong., 1st Sess. ——, *reprinted in* 1971 U.S.Code Cong. & Ad.News 1883. *See* S.Rep. No. 437, 92d Cong., 1st Sess. ——, *reprint-ed in* 1971 U.S.Code Cong. & Ad.News 1918; Treas.Reg. 1.993–4(a)(2)(v):

§ 1.993–4(a)(2)(v) *Refinancing, renewal, and extension.* For purposes of applying this section, the refinancing, renewal, or extension of a producer's loan shall be treated as the making of a new loan which may qualify as a producer's loan only if the requirements of subparagraph (1) of this paragraph [on re-

mand notes in question were neither in compliance nor in substantial compliance with 26 U.S.C.A. § 993(d)(1). Accordingly, the Tax Court did not err in finding that the loans in question were not qualified export assets, and that International did not qualify as a DISC for the years 1975, 1976, and 1977.

## COMMISSIONS RECEIVABLE

### Validity of Regulations

Farms and International filed a motion for reconsideration with the Tax Court asking that the value of the non-qualified assets be determined so it could make a "deficiency distribution" under 26 U.S.C.A. § 992 in order for International to qualify as a DISC for the taxable years in question.[11] As a prerequisite to exercise of the option of making a deficiency distribution, the corporation must show that its failure to meet the qualified export receipts and qualified export assets tests and the failure to make such distribution prior to the date

on which it was actually made was due to reasonable cause. Further, if the deficiency distribution is made more than nine and one-half months after the end of the taxable year with respect to which it is made, the corporation must pay interest. 26 U.S. C.A. § 992(c)(2)(B). While section 992(c) does specify that the distribution must be made after the end of the taxable year, it does not set a time within which the distribution must be made. The Secretary, through promulgation of Treas.Reg. § 1.992–3(c)(3), requires that the distribution be made within ninety days "from the date of the first written notification to the corporation by the Internal Revenue Service that it had not satisfied ... the 95 percent assets test ... for a taxable year."[12] The key question before the Tax Court on reconsideration was whether the commissions owed and paid to International by Farms were qualified export assets. To answer this question, we must determine whether Treas.Reg. §§ 1.993–2(d)(2) and 1.994–1(e)(3) are valid regulations.[13]

quirements for qualification as a producer's loan] are met.

11. Title 26 U.S.C.A. § 992 provides in relevant part:

(c) Distributions to meet qualification requirements.—

(1) In general.—Subject to the conditions provided by paragraph (2), a corporation which for a taxable year does not satisfy a condition specified in paragraph (1)(A) (relating to gross receipts) or (1)(B) (relating to assets) of subsection (a) shall nevertheless be deemed to satisfy such condition for such year if it makes a pro rata distribution of property after the close of the taxable year to its shareholders (designated at the time of such distribution as a distribution to meet qualification requirements) with respect to their stock in an amount which is equal to—

(A) if the condition of subsection (a)(1)(A) is not satisfied, the portion of such corporation's taxable income attributable to its gross receipts which are not qualified export receipts for such year,

(B) if the condition of subsection (a)(1)(B) is not satisfied, the fair market value of those assets which are not qualified export assets on the last day of such taxable year, or

(C) if neither of such conditions is satisfied, the sum of the amounts required by subparagraphs (A) and (B).

(2) Reasonable cause for failure.—The conditions under paragraph (1) shall be deemed

satisfied in the case of a distribution made under such paragraph—

(A) if the failure to meet the requirements of subsection (a)(1)(A) or (B), and the failure to make such distribution prior to the date on which made, are due to reasonable cause; and

(B) ... if such corporation makes such distribution after the 15th day of the 9th month after the close of the taxable year, and amount ... treated as interest.

12. Treas.Reg. § 1.992–3(c)(3) provides in relevant part:

(3) *Time limit for deficiency distribution.* ... the time limit ... for making a deficiency distribution is satisfied if the amount of the distribution ... is made within 90 days from the date of the first written notification to the corporation by the Internal Revenue Service that it had not satisfied the 95 percent of gross receipts test or the 95 percent assets test or both tests, for a taxable year.

13. Treas.Reg. § 1.993–2(d)(2) provides in relevant part:

(d) *Trade receivables —*

(2) ... If a DISC acts as commission agent for a principal in a transaction described in § 1.993–1(b) ... which results in qualified export receipts for the DISC, and if an account receivable or evidence of indebtedness held by the DISC and representing the com-

The Tax Court found the challenged regulations to be valid. It observed, first, that 26 U.S.C.A. § 993(b) does not expressly include commissions receivable in its definition of qualified export assets, yet, the Secretary has provided, through Treas. Reg. § 1.993–2(d)(2), that commissions receivable in certain situations may constitute qualified export assets. Since Farms was a "related supplier" within the meaning of section 1.994–1(a)(3), the sixty-day rule for payment of commissions receivable applied to the commissions owed International. The commissions were not timely paid. Accordingly, the Tax Court determined that the commissions receivable were not qualified export assets.

The definition of qualified export assets is found at 26 U.S.C.A. § 993(b). That section provides that "accounts receivable" may be qualified export assets if they derive from particular transactions of the DISC. These transactions are identified in 26 U.S.C.A. § 993(a)(1) (1982). They include the sale or exchange of export property and of qualified export assets, the lease or rental of export property, provision of services related to any qualified sale, exchange, lease, rental, etc., provision of engineering or architectural services for construction projects located outside the United States, and the provision of managerial services in the furtherance of other qualified export receipts of the DISC. This section does not identify the acts of a commission agent as a "transaction of such corporation." The only mention of commis-

sions within section 993 is found at subsection (f): "In the case of commissions on the sale, lease, or rental of property, the amount taken into account for purposes of this part as gross receipts shall be the gross receipts on the sale, lease, or rental of the property on which such commissions arose." 26 U.S.C.A. § 993(f) (1982). The only other relevant mention of commissions is found in 26 U.S.C.A. § 994(b).[14] This section specifically authorizes the Secretary of the Treasury to promulgate regulations concerning the price due to be paid by the DISC or received by the DISC in cases of commissions, rentals, or sales of export property derived from transactions between a DISC and a related person. In light of the mentioning of commissions in section 993(f) and in section 994(b), the Tax Court determined that at best the reference in section 993(b)(3) to accounts receivable deriving from transactions of such corporation did not clearly include or exclude commissions receivable as accounts receivable.

In other words, section 993(b)(3) provides qualified asset treatment for a DISC's accounts receivable arising out of transactions (e.g., sales) 'of such corporation'; a DISC which functions as a commission agent has no sales. In using the term 'accounts receivable' in section 993(b)(3), Congress may have intended to include only those accounts receivable owed to the DISC for sales it made, or owed to the principal, but purchased and held by the DISC, for sales made by the

---

mission payable to the DISC as a result of the transaction arises (and, in the case of an evidence of indebtedness, designated on its face as representing such commission), such account receivable or evidence of indebtedness shall be treated as a trade receiveable [sic]. If, however, the principal is a related supplier (as defined in § 1.994–1(a)(3)) with respect to the DISC, such account receivable or evidence of indebtedness will not be treated as a trade receivable unless it is payable and paid in a time and manner which satisfy the requirements of § 1.994–1(e)(3) or (5) (relating to initial payment of transfer price or commission and procedure for adjustments to transfer price or commission, respectively)....

Treas.Reg. § 1.994–1(e)(3) provides in relevant part:

(3)(i) The amount of a ... sales commission ... actually charged by a DISC to a related supplier, in a transaction to which section 994 applies must be paid no later than 60 days following the close of the taxable year of the DISC during which the transaction occurred.

**14.** Title 26 U.S.C.A. § 994 provides in pertinent part:

§ 994. Inter-company pricing rules.

. . . .

(b) Rules for commissions, rentals, and marginal costing.—The Secretary shall prescribe regulations setting forth—

(1) rules which are consistent with the rules set forth in subsection (2) for the application of this section in the case of commissions, rentals, and other income....

principal where the DISC functioned solely as commission agent. Such interpretation is suggested by the House and Senate committee explanations of section 993(b)(3):

> The types of assets classified as qualified export assets are—
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> (3) accounts receivable * * * of the corporation (*or if the corporation acts as agent, the principal*) held by the corporation which arose in connection with qualified export sale * * * transactions * * * [H.Rept. 92–533 (1971), 1972–1 C.B. 498, 533; S.Rept. 92–437 (1971), 1972–1 C.B. 559, 614 [emphasis added].

In short, the express reference to commissions in section 993(f) and 994(b) reveals that Congress certainly had in mind that commission arrangements might be used in sales involving DISCs, but it is not at all clear that the reference to accounts receivable in section 993(b)(3) was intended to include commissions receivable owed by a production company to a related DISC acting as selling agent....

> [As] the extent to which Congress intended commissions receivable owed by the producer to the related DISC to constitute qualified export assets is unclear ... the challenged regulation can in no way be said to contradict or limit the 'unambiguous' language of section 993(b)(3).

79 T.C. 1054 at 1063–1064. Since section 993(b)(3) was ambiguous, the Tax Court correctly sought to determine whether the challenged regulation is consistent with the statutes' origin and purpose. *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 102 S.Ct. 821, 70 L.Ed.2d 792 (1982). The Tax Court understood that a major purpose of the DISC legislation was to guarantee that loans from a DISC to a producer are used to encourage exporting. The Tax Court reasoned that if the producer is not required to pay the commissions within a particular period of time, that producer would have an unlimited use of the tax-deferred DISC income.

> In the absence of the challenged regulation, the receivable representing the debt would be a qualified asset. Thus, the DISC could achieve qualified asset treatment of a 'loan' which was not subject to the producer's loan limitation. The DISC could meet the 95-percent assets test even though its tax deferred profits were not applied solely to export activities. Such result contradicts the purpose for which the DISC legislation was enacted ....
>
> If 'accounts receivable' include only the obligations of unrelated third parties, there was no reason to be concerned about disguised loans, but if such receivables included obligations of a related producer, there existed the possibility that for their own reasons, they might postpone indefinitely the payment of such a receivable and thereby frustrate the producer loan limitations. In light of the potential for frustration of a clear congressional purpose, we cannot hold that the challenged regulation is unreasonable or out of harmony with the origin and purpose of the DISC provisions.

79 T.C. at 1066.

Farms and International argue that section 993(b)(3) is not ambiguous, and therefore, "the regulations [section 1.993–2(d)(2) and section 1.994–1(e)(3) ] add a condition to the statutory requirements and are invalid." *Caterpillar Tractor Co. v. United States*, 589 F.2d 1040, 218 Ct.Cl. 517 (1978). Farms and International contend that the only qualification of which receivables are to be considered "accounts receivable" is whether they arise from transactions identified in section 993(a), defining gross receipts. They reason that since section 993(f) also defines gross receipts, and since that section identifies commissions as a gross receipt, then section 993(f) qualified section 993(a). Commissions receivable, therefore, are accounts receivable because they fall under "transactions of such corporation" under section 993(b) as defined by section 993(a) and (f). Because the statute does not place a limit on the types of ac-

counts receivable which qualify, and the regulations do, the regulations are contrary to the statute and are invalid. Farms and International rely heavily on the recent case of *Thomas International Ltd. v. United States*, 6 Cl.Ct. 414 (1984), to support their argument that the regulations were invalid. *Thomas International*, however, is not wholly applicable to the validity issue because the Claims Court conceded that "it is unnecessary to decide at this time whether section 1.994–1(e)(3) is valid." *Thomas International*, 6 Cl.Ct. at 421. Rather, the court held that "adoption of the portion of that regulation dealing with commissions, to disqualify a corporation as a DISC under the section 992 test, is in itself unauthorized." *Thomas International* at 421. It is on the question of the authority for the regulations that *Thomas International* has relevance and where we must begin our determination as to the ultimate validity of the regulations.

Our review of the question of validity of the regulations must have as a preliminary task the identification of the kind of regulation involved, thus, identifying the source of the regulation's authority.

[T]he current trend in tax cases appears to be shifting towards more careful scrutiny of IRS regulations. *See U.S. v. Vogel Fertilizer Co.*, 455 U.S. 16, 24–26, 102 S.Ct. 821, 827–28, 70 L.Ed.2d 792 (1982) (invalidating Treasury Regulation that did not 'harmonize' with the 'origin and purpose' of the enabling act); *Rowan Cos. v. U.S.*, 452 U.S. 247, 252–53, 101 S.Ct. 2288, 2292, 68 L.Ed.2d 814 (1981) (invalidating Treasury Regulation that failed to construe the term 'wages' in 'consistent and reasonable manner'); *U.S. v. Cartwright*, 411 U.S. 546, 557, 93 S.Ct. 1713, 1719, 36 L.Ed.2d 528 (1973) (invalidating Treasury Regulation even though it was 'not, on its face, technically inconsistent' with the enabling provision of the Internal Revenue Code).

[I]t is well settled that a court may, when appropriate, substitute its judgment for an agency's when the regulation is 'interpretative' as opposed to 'legislative.' *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976); *Batterton v. Francis*, 432 U.S. 416, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977) .... A Treasury Regulation ... promulgated pursuant to the Commissioner's general authority to 'prescribe all needful rules and regulations,' 26 U.S.C. § 7805(a) (1976), is clearly 'interpretative' and therefore calls for less deference than a regulation issued under a specific delegation of authority to define a particular statutory term. *Rowan Cos., supra*, 452 U.S. at 253, 101 S.Ct. at 2292.

*Estate of Applebaum v. Commissioner of Internal Revenue*, 724 F.2d 375, 381 n. 5 (3d Cir.1983).

It has been held that regulations issued pursuant to [specific authority] are legislative. *Yellow Freight System v. United States*, 538 F.2d 790, 795–96 (8th Cir. 1976).

[A] legislative regulation ... has the same effect as a valid statute. If valid, we are thus compelled to give effect to it. *Batterton v. Francis*, 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977).

*Long v. United States*, 652 F.2d 675, 678 n. 7 (6th Cir.1981). *See United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 24, 102 S.Ct. 821, 827, 70 L.Ed.2d 792 (1982); *National Muffler Dealers Association v. United States*, 440 U.S. 472, 99 S.Ct. 1304, 59 L.Ed.2d 519 (1979). Our first question, therefore, is whether the challenged regulations are supported by the specific authority of 26 U.S.C.A. § 994(b)(1) or by the general authority of 26 U.S.C.A. § 7805(a).

The Tax Court avoided the issue by reasoning that even if not supported by the specific authority of section 994(b), the regulations are supported by the general grant of authority in section 7805. 79 T.C. at 1066–1067. Farms and International argue that the only statutory authority for the challenged regulations is section 7805. They contend that section 994's grant of specific authority is limited to the promulgation of regulations "consistent with the

rules ... in subsection (a) for the application of *this* section [994]." 26 U.S.C.A. § 994(b)(1) (emphasis added). From their view, "had Congress intended this grant to apply to all transactions between related parties ... it would have provided for rules for the application of 'this part,' not 'this section.'" The Commissioner argues that the specific authority of section 994 applies to the remaining DISC sections because each section has meaning only when read in the context of the whole DISC legislation. The Commissioner understands that this position is consistent with both the House and Senate reports on the DISC legislation.

> The bill also provides that the Secretary of the Treasury may prescribe by regulations intercompany pricing rules, consistent with those provided by the bill in the case of export transactions where the DISC does not take title to the property, but instead acts as commission agent for the sale, or is a lessee of the property which it then subleases to its customers.

H.R.Rep. No. 533, 92d Cong., 1st Sess. ——, *reprinted in* 1971 U.S.Code Cong. & Ad. News 1888; S.Rep. No. 437, 92d Cong., 1st Sess. ——, *reprinted in* 1971 U.S.Code Cong. & Ad.News 2014.

It is far too apparent, as might have been conceded by the Tax Court, that the Secretary of the Treasury promulgated the challenged regulations under his general authority to "prescribe all needful rules and regulations for the enforcement of this title." 26 U.S.C.A. § 7805(a). Section 994(b), by its terms, is a grant of authority to prescribe rules limited to that section. That this is the intent of Congress is made even more clear by the Commissioner's citing of the House and Senate reports which iterate that the bounds of this specific grant of authority is section 994. Accordingly, the challenged regulations are not legislative, but interpretive.

■ The standard of review of the validity of an interpretive regulation is whether the regulation "harmonizes with the statutes 'origin and purpose.'" *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 26, 102

S.Ct. 821, 828, 70 L.Ed.2d 792 (1982); *National Muffler Dealers Association v. United States*, 440 U.S. 472, 477, 99 S.Ct. 1304, 1307, 59 L.Ed.2d 519 (1979). The challenged regulations, therefore, must be in harmony with the purpose of the overall DISC legislation, sections 991–997, not just that of section 994 as Farms and International have argued. *See U.S. v. Vogel Fertilizer*, 455 U.S. 16, 102 S.Ct. 821, 70 L.Ed.2d 792 (1982); *Long v. United States*, 652 F.2d 675 (6th Cir.1981).

■ As identified under the discussion of producer's loans, the purpose of the DISC provisions was to give tax breaks to domestic producers when and for only so long as the income produced under this tax benefit program is used for export production and not for domestic purposes. The Claims Court in *Thomas International* implies, if not suggests, that a principal purpose of the DISC legislation was to provide for commission DISCs and to give them a substantial degree of protection. Taking the view that a commission DISC subject to the challenged regulations would have substantial problems qualifying as a DISC under the qualified export test, the court reasoned:

> To avoid disqualification of commission DISCs, 'accounts receivable ... which arise by reason of transaction of such corporation (the DISC)' must necessarily be understood to include sales in which the DISC is assigned by the producer the role of commission agent rather than reseller.

*Thomas International* at 419. There is no question that Congress contemplated that a DISC may function as a commission agent in certain circumstances. *See* 26 U.S.C.A. §§ 993(f) and 994(b). No where in the statutory scheme, however, does any evidence exist that Congress intended Commission DISCs to assume a preferred position over buy-sell DISCs. Indeed, given the ambiguity inherent in the scant references to commission DISCs in section 993(f) and in section 994(b), it is quite reasonable to conclude that the plight of commission DISCs was, at best, of secondary importance to

the drafters of the DISC legislation. Further, the major purpose of the DISC statutory scheme is to assure that the income generated by the DISC goes to export production. As the Commissioner argues, to invalidate the challenged regulations, which do no more than set a due date for the payment of commissions receivable, would run counter to the purpose of regulating the interest-free loans that the DISC is able to make to a related person. Accordingly, we hold that Treas.Reg. 1.993–2(d)(2) and 1.994–1(e)(3) are harmonious with the origin and purpose of the DISC legislation. The challenged regulations, therefore, are valid.

### Retroactive Application of Regulations

Farms and International argue that the sixty-day rule is invalid as applied to them retroactively. The scenario on which this claim is based was amply described by the Tax Court:

> The DISC provisions (sections 991–997) were contained in the Revenue Act of 1971, Pub.L. 92–178, 85 Stat. 535. A corporation could qualify as a DISC for any taxable year beginning after December 31, 1971. Sec. 507, Rev. Act of 1971, *supra*, 85 Stat. 553. In January 1972, the Treasury published 'DISC—A Handbook for Exporters' (Handbook) containing a 'plain language' explanation of the law pertaining to DISCs. The Handbook provided that accounts receivable which arose in connection with the DISC's qualified export sale transactions were qualified export assets whether the DISC acted as principal or agent. The Handbook did not expressly refer to commissions receivable. *The IRS promised that it would follow the rules explained in the Handbook until such rules were modified 'in regulations or other Treasury publications.' The Handbook provided that any such modifications adverse to taxpayers would be applied only prospectively.* On September 21, 1972, the Commissioner proposed section 1.994–1(e)(3), Income Tax Regs., 37 Fed.Reg. 19625, 19627–19628, and on October 4, 1972, the Commissioner proposed section 1.993–2(d)(2), Income Tax Regs., 37 Fed. Reg. 20853, 20858. These proposed regulations were the first pronouncements concerning the treatment of commissions receivable, and they both contained the 60-day payment rule. Proposed section 1.994–1(e)(3) was finally adopted on September 29, 1976 (T.D. 7435, 1976–2 C.B. 238) and contained the 60-day rule; proposed section 1.993–2(d)(2) was finally adopted on October 14, 1977 (T.D. 7514, 1977–2 C.B. 266), and incorporated the 60-day rule by reference to section 1.994–1(e)(3). *Section 1.993–2(d)(2), Income Tax Regs., was made applicable to taxable years ending after December 31, 1971.*

79 T.C. at 1067–1068 (emphasis added).

█ Internal Revenue Regulations are presumed to have retroactive effect. *Anderson, Clayton & Co. v. United States*, 562 F.2d 972 (5th Cir.), *cert. denied*, 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785 (1978). *See* 26 U.S.C.A. § 7805(b) (1967). Under section 7805(b), the Secretary of the Treasury has broad discretion to limit the retroactive application of Treasury rulings and regulations. "The decision to make a ruling or regulation retroactive will stand unless it constitutes an abuse of discretion." *Wendland v. Commissioner of Internal Revenue*, 739 F.2d 580, 581 (11th Cir.1984) (citing *Automobile Club of Michigan v. Commissioner*, 353 U.S. 180, 184, 77 S.Ct. 707, 710, 1 L.Ed.2d 746 (1957)). An abuse of discretion may be found where the retroactive regulation alters settled prior law or policy upon which the taxpayer justifiably relied and if the change causes the taxpayer to suffer inordinate harm.

Farms and International argue that an abuse of discretion occurred because the Commissioner made an explicit promise in the Handbook that (1) the Internal Revenue Service would follow the rules and procedures set forth in the Handbook until those rules and procedures are "modified" by "regulations or other Treasury publications"; and (2) that any adverse modifications would be applied only prospectively. They argue that they justifiably relied on

the Handbook since the proposed regulations issued in 1972 were not "modifications" of the Handbook, and, even if they were, according to the promise of the Handbook, they should be applied only prospectively. Farms and International rely on the recent case of *Lecroy Research Systems Corp. v. Commissioner*, 751 F.2d 123 (2d Cir.1984) (*Lecroy*).

■ The Second Circuit, in *Lecroy*, found that the Commissioner committed an abuse of discretion in applying the identical regulations challenged here retroactively because that court found the promise in the Handbook to be binding. The court noted that "retroactive application is permissible even where the regulation contradicts a previous Treasury publication such as the Handbook," but observed that "the Handbook's assurances were deliberately unusual in purporting to offer safety in the *status quo* and were obviously prompted by the need to render the incentives Congress intended to create operable as soon as possible." *Lecroy* at 126, 127. The Second Circuit announced and applied the rule that "absent this assurance of prospectivity to taxpayers ... the regulation in question could clearly have been imposed retroactively." *Lecroy* at 126. As authority, the court cites the former Fifth Circuit case of *Carpenter v. United States*, 495 F.2d 175, 184 (5th Cir.1974). *Carpenter*, in fact, contradicts this proposition. In *Carpenter*, a petroleum engineer who had been working in the Middle East for ten years brought a suit for redetermination of a tax deficiency for that period under a statute permitting a bona fide resident of a foreign country for a particular tax year to exclude from income amounts earned from non-United States sources during that period of absence. The taxpayer argued that he maintained his status as a "foreign resident" during the taxable year in question by following the prescriptions of a Treasury Department publication. The former Fifth Circuit held that the taxpayer's reliance was misplaced.

We do not fault the Treasury Department for trying to provide guidelines for taxpayers confronted with the bewildering maze of our tax laws, and we sympathize with the taxpayer who in fact relies upon what he accepts as an authoritative interpretation of the laws and of the Treasury publication. But nonetheless it is for the Congress and the courts and not the Treasury to declare the law applicable to a given situation. As the Ninth Circuit has observed: 'Nor can an interpretation by taxpayers of the language used in government pamphlets act as an estoppel against the government nor change the meaning of taxing statutes ....' *Adler v. Commissioner of Internal Revenue*, 9 Cir.1964, 330 F.2d 91, 93. *Carpenter v. United States*, 495 F.2d at 184. It is settled law that Treasury publications such as the Handbook, which purport to provide a general explanation of the revenue laws, are simply guidelines for taxpayers and do not bind the Commissioner in subsequent litigation. *Carpenter v. United States*, 495 F.2d 184. *See also United States v. New York Telephone Co.*, 644 F.2d 953, 959 n. 10 (2d Cir.1981).

It is unfortunately all too common for government manuals, handbooks, and in-house publications to contain statements that were not meant or are not wholly reliable. If they go counter to governing statutes and regulations of the highest or higher dignity, e.g. regulations published in the Federal Register, they do not bind the government, and persons relying on them do so at their peril. *Caterpillar Tractor Co. v. United States*, 589 F.2d 1040, 1043, 218 Ct.Cl. 517 (1978) (*A Handbook for Exporters*, a Treasury publication). *Dunphy v. United States* [529 F.2d 532, 208 Ct.Cl. 986 (1975) ], *supra* (Navy publication entitled *All Hands*). In such cases it is necessary to examine any informal publication to see if it was really written to fasten legal consequences on the government. *Dunphy, supra. See also Donovan v. United States*, 433 F.2d 522 (D.C.Cir.), *cert. denied*, 401 U.S. 944, 91 S.Ct. 955, 28 L.Ed.2d 225 (1971). (*Employees Performance Improvement Handbook*, an FAA publication) (merely advisory and

directory publications do not have mandatory consequences).

*Bartholomew v. United States,* 740 F.2d 526, 532 n. 3 (7th Cir.1984) (quoting *Fiorentino v. United States,* 607 F.2d 963, 968, 221 Ct.Cl. 545 (1979), *cert. denied,* 444 U.S. 1083, 100 S.Ct. 1039, 62 L.Ed.2d 768 (1980).

 *Lecroy's* proposition that the statements in the handbook were binding is inapposite to the accepted law among the circuits that publications are not binding.[15] We find that the Commissioner did not abuse his discretion in promulgating the challenged regulations. First, Farms and International did not justifiably rely on the Handbook. Taxpayers who rely on Treasury publications, which are mere guidelines, do so at their peril. *Caterpillar Tractor v. United States,* 589 F.2d 1040, 1043, 218 Ct.Cl. 517 (1978). Further, the Treasury's position on the sixty-day rule was made public through proposed section 1.993–2(d)(2) in 1972, before the taxable years at issue. *Charbonnet v. United States,* 455 F.2d 1195, 1199–1200 (5th Cir. 1972). *See also Wendland v. Commissioner of Internal Revenue,* 739 F.2d 580, 581 (11th Cir.1984). Second, whatever harm has been suffered by Farms and International resulted from a lack of prudence. As even the *Lecroy* court has recognized, "safety lies in complying with proposed regulations." *Lecroy* at 127. *See also* 79 T.C. at 1069. "Thus, taxpayers knowingly engaged in ... questionable transaction(s), the legitimacy of which depended upon ... invalidation of proposed regulations. Under such circumstances, the Commissioner cannot be said to have abused his discretion in giving the [regulation] retroactive effect." *Wendland,* 739 F.2d at 582. Finally, the challenged regulations did not "alter settled prior law." Absent the adoption of the challenged regulations, the treatment of commissions receivable was not settled law. In light of the lack of any definitive treatment of com-

missions receivable, Farms and International had no "vested interest in a hypothetical decision in ... [their] favor prior to the advent of the regulations." *Helvering v. Reynolds,* 313 U.S. 428, 433, 61 S.Ct. 971, 974, 85 L.Ed. 1438 (1941); *Chock Full O' Nuts Corp. v. United States,* 453 F.2d 300, 303 (2d Cir.1971). We find, therefore, that the Commissioner did not abuse his discretion in applying retroactively Treas.Reg. 1.993–2(d)(2) and 1.994–1(e)(3).

## CONCLUSION

We conclude that the loans made by International to Farms were not producer's loans either at the time of their execution or at renewal, that the commissions receivable were not qualified export assets when untimely paid, and that the Commissioner did not abuse his discretion in applying retroactively the challenged regulations. We hold, therefore, that International did not qualify as a DISC for the taxable years 1975, 1976, and 1977. The Tax Court ruling is affirmed.

**AFFIRMED.**

---

**15.** As the Tax Court reasoned, however, even if the promises in the Handbook were found to be binding, the Commissioner did not break the promises. Proposed regulation 1.993–2(d)(2) which contained the original sixty-day rule was a subsequent Treasury publication. "This proposed regulation was published before the beginning of the taxable years at issue; thus, this modification of the Handbook's provisions was in effect during such years." 79 T.C. at 1069.