A.B. LONG, Jr., et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 83–85T.

United States Claims Court.

May 14, 1986.

Mack A. Gentry, Knoxville, Tenn., for plaintiffs. James S. Tipton, Jr., and Dennis G. Webb, Gentry, Tipton & Webb, Knoxville, Tenn., of counsel.

Betty N. Ferber, Washington, D.C., with whom were Mildred L. Seidman, Gerald B.

Leedom, and Acting Asst. Atty. Gen. Roger M. Olsen, for defendant.

## OPINION

NETTESHEIM, Judge.

The question to be resolved is whether a limited partnership can take a current-year deduction in the year liability is accrued for payment of advanced royalties pursuant to what they contend is a minimum royalty provision of a mineral sublease. Defendant moved, over plaintiffs' opposition, for summary judgment, although plaintiffs take the position that no genuine issue of material fact impedes granting summary judgment in their favor.

## FACTS

The following facts that are not a matter of statute, regulation, case law, or agency interpretation are undisputed. A.B. Long, Jr., and Kathleen Long and ten other named individuals ("plaintiffs") are limited partners in Signal Coal Company, Ltd.

("Signal" or the "partnership"). Three plaintiffs are also shareholders in General Coal Company, Inc. ("General Coal"), Signal's general partner.

Upon its formation on August 1, 1977, Signal entered into a sublease (the "sublease") with Coal Properties, Ltd. ("Coal Properties"), under which Signal was granted the right to strip mine coal from the sublessor's property, located in Scott County, Tennessee. Each limited partner plaintiff previously had engaged actively in coal mining business in the area. The sublease was to extend ten years and thereafter until the exhaustion of all "mineable and merchantable" coal. Plaintiffs were obligated under the sublease to pay annually a "minimum royalty" corresponding to the number of tons of coal to be mined or sold in a particular year, whether or not coal was mined and sold in that year.

Section 7(a) of the sublease sets forth the partnership's schedule of minimum royalty payments, as follows:

| Lease Year Commencing | Minimum Royalty | No. of Tons |
|---|---|---|
| Aug. 1, 1977–Dec. 31, 1977 | $1,417,000 | 325,700 |
| Jan. 1, 1978–Dec. 31, 1978 | 500,000 | 114,900 |
| Jan. 1, 1979–Dec. 31, 1979 | 500,000 | 178,550 |
| Jan. 1, 1980–Dec. 31, 1980 | 500,000 | 212,765 |
| Jan. 1, 1981–Dec. 31, 1981 | 500,000 | 212,765 |
| Jan. 1, 1982–Dec. 31, 1982 | 750,000 | 319,150 |
| Jan. 1, 1983–Dec. 31, 1983 | 750,000 | 319,150 |
| Jan. 1, 1984–Dec. 31, 1984 | 750,000 | 319,150 |
| Jan. 1, 1985–Dec. 31, 1985 | 750,000 | 319,150 |
| Jan. 1, 1986–Dec. 31, 1986 | 750,000 | 319,150 |
| Jan. 1, 1987–Dec. 31, 1987 | 1,000,000 | 466,813 |
| Jan. 1, 1988–Dec. 31, 1988 | 1,000,000 | 476,190 |

Signal was to continue to pay $1,000,000 per year corresponding to an estimate of 476,190 tons of mined coal in the event the sublease period extended beyond December 31, 1988. If Signal mined and sold less than the quantity stated for a particular year, section 7(b) of the sublease permitted crediting of the advanced royalty payment due and payable in that year against royalties payable in future years when the partnership mined and sold more than the stated quantity of coal.

Section 7(a) further established the manner in which the minimum royalties were to be paid:

For the first $3,417,000 of minimum royalties due, Sublessee [Signal] shall be absolutely liable for said amount upon the signing of this lease regardless of the number of tons of coal mined.

The minimum royalties shall be paid as follows:

$1,000,000 of the $1,417,000 minimum royalty due in the first year shall be paid

upon the signing of this lease. The remaining $417,000 shall be due upon the signing of this lease, but need not be paid until April 15, 1978. However, any amount not paid when due shall bear interest at the rate of eight (8%) percent per annum. The minimum royalties for all years subsequent to the first year shall be due and payable on April 15 of the year to which the payment applies. Any amount of the $3,417,000 not paid upon the signing of this agreement shall be evidenced by two non-negotiable, non recourse notes. One for $417,000 representing the amount of royalty due in 1977 and therefore bearing interest at eight (8%) percent per annum until paid in full. The second note for $2,000,000, bearing no interest and payable in equal annual installments of $500,000 per year due on April [sic] of each year.

Signal supplied Coal Properties with two "Non-negotiable, Non recourse Installment Promissory Note[s]" upon the execution of the sublease. Signal was obligated under one note to pay $405,072 in installments. The note further stipulated: "Payments under this Note shall be due on August 1, 1977, but need not be paid in full until April 20, 1978: provided, however, the unpaid portion shall bear interest at the rate of eight per cent (8%) per annum until paid in full." The partnership's second note was issued in accordance with the terms set forth in section 7(a) of the sublease and called for equal annual payments of the principal sum of $2,000,000. With respect to their nonrecourse status, both of Signal's promissory notes provided:

It is a condition of this Note, that in the event of any default by Payor hereunder, Payee and its successors and assigns shall only be able to look to the assets of the [Payor] and they shall not seek any deficiency or other judgment against any of the Partners including the General Partners.

Upon signing the sublease on August 1, 1977, Signal paid the sublessor $1,000,000. On October 17, November 14, and December 27 of the same year, the partnership paid $19,945.35, $20,197.73, and $41,131.99, respectively. By these latter three installments totalling $81,275.07, the partnership sought to satisfy a part of the former, or interest-bearing, note. From January through June of 1978, Signal paid $418,724.93 in the following amounts by monthly installments: $19,752.00, $19,860.85, $11,827.60, $56,385.71, $61,507.43, and $249,391.34. By these payments Signal sought to satisfy the remaining balance on the interest-bearing note. In satisfaction of the second promissory note, Signal paid the sublessor $500,000 on or about April 1 of the years 1978 through 1981. For the years in issue, 1977–1981, Signal received $1,132,553, $6,715,371, $6,964,179, $7,719,391, and $3,736,710, respectively, as proceeds from the sale of coal actually mined.

Signal maintained its books and records and filed its partnership tax returns on an accrual basis. For 1977 the partnership claimed a deduction for $3,448,920.96, representing the alleged accrued liability of the partnership for royalty payments for 1977–1981. On their personal income tax returns, plaintiffs each claimed a distributive share of the deduction taken by Signal. The Internal Revenue Service (the "IRS") disallowed $2,000,000 of the deduction taken in 1977, contending that this part could not be attributed to Signal's earnings in 1977. For 1978 Signal's entire deduction of $500,000 was disallowed. Accordingly, the IRS determined deficiencies with respect to each of plaintiffs' 1977 and 1978 tax years. Plaintiffs paid their assessed deficiencies and submitted claims for refund. On or about October 10, 1984, plaintiffs' refund claims were disallowed. Plaintiffs have also filed protective claims for refund for the years 1978, 1980, and 1981. The IRS has taken no action regarding these protective claims. On February 8, 1985, plaintiffs commenced suit in this court seeking to recover federal income taxes and assessed interest in the amount of $404,593.80.

*Burnet v. Hutchinson Coal Co.*, 64 F.2d 275 (4th Cir.), *cert. denied*, 290 U.S. 652, 54 S.Ct. 69, 78 L.Ed. 565 (1933), analogized an

advanced minimum royalty to rent paid annually. It is a recurring charge and "regardless of future contingencies, must be paid" or the lease to which it applies is forfeited. 64 F.2d at 278. Once a minimum royalty is paid, that part of the payment "not represented by coal actually mined can never be recovered except in the exercise of a vague and indefinite future right to mine the coal." *Id.* On the other hand, an advanced royalty or bonus is not in the nature of an obligation recurring annually. A taxpayer required to pay an advanced royalty or bonus does so expecting "to receive ... [a] benefit over a definite number of ... years." *Id.*

The Board of Tax Appeals began deciding the timing of deductions for advanced minimum royalties as early as 1926 in *W.S. Bogle & Co. v. Commissioner*, 5 B.T.A. 541 (1926), *aff'd*, 26 F.2d 771 (7th Cir.1928). G.C.M. 7937, 1930–1 C.B. 87, 88, assimilated the Board decisions and distinguished, for purposes of the timing of deductions, between those instances in which a mining lease contains a provision permitting the lessee to recoup in future years any part of the minimum royalties paid in excess of royalties representing the actual tonnage mined and those in which such a provision was not included in the lease. Where recoupment was permitted, a lessee unable to mine in any year a quantity of coal equal to the minimum royalty payment required under the lease could deduct only that part of the royalty payments which actually represented the tonnage mined during the year in question. Where recoupment was not permitted, the entire advanced minimum royalty would be deemed deductible in the year of payment or accrual of liability. *Id.*

*Burnet* eliminated the distinction recognized in G.C.M. 7937. That case involved a mining lease requiring the annual payment of a minimum royalty and permitting recoupment, if necessary, of such royalties against future coal production. The court

of appeals held that despite the existence of a recoupment provision, funds paid as a minimum royalty for a particular year that exceeded the value of coal actually mined in that year nevertheless were deductible in the year paid. Such treatment was deemed warranted because the occurrence of any one of a number of contingencies would serve to defeat recoupment of the lessee's excess payment. 64 F.2d at 278. The Second and Third Circuits in *Helvering v. Russian Finance & Construction Corp.*, 77 F.2d 324, 328 (2d Cir.1935), and *Commissioner v. Jamison Coal & Coke Co.*, 67 F.2d 342, 344 (3d Cir.1933), adopted the holding of *Burnet.*

Treas.Reg. 101, art. 23(m)–10, as made applicable to the Internal Revenue Code (the "I.R.C.") by T.D. 4885, 1939–1 C.B. 396, prescribed rules concerning depletion of mineral deposits under I.R.C. §§ 23(m), 114, 26 U.S.C. §§ 23(m), 114 (1934). In 1940 subparagraph (e) was added to § 9.23(m)–10, T.D. 4960, 1940–1 C.B. 38, 42; Treas.Reg. § 9.23(m)–10(e), 26 C.F.R. § 9.23(m)–10(e) (1940). The addition was consistent with *Burnet, see* G.C.M. 36,573 at 7 (Feb. 4, 1976), but it also offered the lessee the option to defer the deduction for advanced minimum royalties until the year receipts were generated that corresponded to the advanced royalty payments.[1] Treas. Reg. § 9.23(m)–10(e) states in pertinent part:

> If a lessee or other owner of operating rights in one or more mineral properties is required to pay royalties on a specified number of units of mineral annually, whether or not extracted within the year, and may apply any amounts paid on account of units not extracted within the year against the royalty on mineral thereafter extracted, he may at his option treat the advanced royalties so paid or accrued in either one of the following manners:

1. Plaintiffs contend that the option to defer deductions was created in the depression era to benefit mining taxpayers facing business losses which far exceeded profits. Under this economic climate, a current deduction of advanced roy-

alty payments provided no tax benefit. By deferring the deduction, the lessee increased its chances of recovering these advanced payments during more prosperous times.

(1) As deductions from gross income for the year the advanced royalties are paid or accrue; or

(2) As deductions from gross income for the year the mineral product in respect of which the advanced royalties were paid is sold.

T.D. 4960, 1940–1 C.B. 42.

On January 20, 1960, the IRS adopted Treas.Reg. § 1.612–3(b), T.D. 6446, 1960–1 C.B. 208, 226–27. Section 1.612–3(b)(1) pertains to "the owner of an ... interest in a mineral deposit ... required to pay royalties on a specified number of units of such mineral ... annually whether or not extracted ... within the year." The regulation is applicable to leases containing advanced minimum royalty provisions by virtue of its reference to an annual payment requirement. Treas.Reg. § 1.612–3(b)(3) restates the same two options available to the taxpayer under the earlier Treas.Reg. § 9.23(m)–10(e), as follows:

(3) The payor, at his option, may treat the advanced royalties so paid or accrued in connection with mineral property as follows:

(i) As deductions from gross income for the year the advanced royalties are paid or accrued, or

(ii) As deductions from gross income for the year the mineral product, in respect of which the advanced royalties were paid, is sold.

T.D. 6446, 1960–1 C.B. 227.

*Burnet,* Treas.Reg. § 9.23(m)–10(e), and its successor Treas.Reg. § 1.612–3(b) each indicated that an annual payment was a prerequisite to a current-year deduction. However, in Rev.Rul. 70–20, 1970–1 C.B. 144, the IRS took the position that the taxpayer's election to deduct royalty payments currently pursuant to Treas.Reg. § 1.612–3(b)(3) was proper when the mining lease at issue permitted payment in nine nonrecurring installments of virtually equal amounts. After the ninth year, payments were no longer required, but the lease remained in effect. Next, Rev.Rul. 74–214, 1974–1 C.B. 148, sanctioned a current-year deduction by a mining company operating under a coal lease that required a royalty payment in advance of mining in the form of one lump-sum payment. In Rev.Rul. 74–214, the IRS determined that the taxpayer's lump-sum payment was an "advanced royalty within the meaning of section 1.612–3(b)" and that the mining company therefore qualified for the option to deduct its royalty payment in its entirety in the year paid under § 1.612–3(b)(3). 1974–1 C.B. 149.

By extending the current-year deduction under Treas.Reg. § 1.612–3(b)(3) to those instances in which royalties are paid in installments without regard to the term of the lease and by lump sum, the annual payment requirement for an advanced minimum royalty was eroded. The IRS began backtracking on the positions taken in these two revenue rulings. According to G.C.M. 36,573 (Feb. 4, 1976), an advanced minimum royalty partakes of an annual recurring cost of holding a lease and is based upon the estimated normal annual production under a lease. *Id.* at 50. Installment or lump-sum payments are nonrecurring and, as such, do not satisfy this criterion. Because such payments are inconsistent with the requirement of annual payments in Treas.Reg. § 1.612–3(b), the IRS indicated in G.C.M. 36,573 that the two options for timing of deductions in Treas. Reg. § 1.612–3(b)(3) should not be available when payment is made in installments or by lump sum. G.C.M. 36,573 at 9.

On October 29, 1976, the IRS issued News Release IR–1687 announcing the suspension of Rev.Rul. 70–20 and 74–214 as of the issuance date of the release. The suspension was brought about by a proposal on November 2, 1976, to modify Treas.Reg. § 1.612–3(b)(3). *See* 41 Fed.Reg. 48,133 (1976). The proposed modification was intended to apply to advanced royalties paid or accrued in connection with mineral property on or after October 29, 1976, and provided in part:

(b) *Advanced Royalties....*

\*    \*    \*    \*    \*    \*

(3) The payor shall treat the advanced royalties so paid or accrued in connection with mineral property as deductions from gross income for the year the mineral product, in respect of which the advanced royalties were paid or accrued, is sold. However, in the case of advanced royalties paid or accrued in connection with mineral property as a result of a minimum royalty provision, the payor, at his option, may instead treat the minimum royalty payments as deductions from gross income for the year in which the minimum royalties are paid or accrued. For purposes of this paragraph, a minimum royalty provision requires that substantially uniform royalty payments be made at least annually over the life of the lease....

41 Fed.Reg. 48,133–34. This proposal resurrected the distinction between advanced royalties and advanced minimum royalties that had been recognized prior to Rev.Rul. 70–20 and 74–214 and added the qualification that annual payments in connection with advanced minimum royalties be made with "substantial uniformity."

Written comments concerning the proposed amendment were to be submitted to the Commissioner by November 23, 1976, in anticipation of the public hearing on the issue scheduled for November 30, 1976. *See* 41 Fed.Reg. 48,133. No additional comments were accepted. On December 14, 1977, the IRS approved the final version of the amendments to Treas.Reg. § 1.612–3(b). *See* T.D. 7523, 1978–1 C.B. 192. The final version revoked Rev.Rul. 70–20 and 74–214, incorporated the originally published proposal in its entirety, and added amending language that had not been published before adoption. The final version provides in pertinent part:

(b) *Advanced Royalties....*

    \*    \*    \*    \*    \*    \*

(3) The payor shall treat the advanced royalties paid or accrued in connection with mineral property as deductions from gross income for the year the mineral product, in respect of which the advanced royalties were paid or accrued, is sold.

For purposes of the preceding sentence, in the case of mineral sold before production the mineral product is considered to be sold when the mineral is produced (i.e., when a mineral product first exists). However, in the case of advanced mineral royalties paid or accrued in connection with mineral property as a result of a minimum royalty provision, the payor, at his option, may instead treat the advanced royalties as deductions from gross income for the year in which the advanced royalties are paid or accrued. See section 446 (relating to general rule for methods of accounting) and the regulations thereunder. For purposes of this paragraph, a minimum royalty provision requires that a substantially uniform amount of royalties be paid at least annually either over the life of the lease or for a period of at least 20 years, in the absence of mineral production requiring payment of aggregate royalties in a greater amount. For purposes of the preceding sentence, in the case of a lease which is subject to renewal or extension, the period for which it can be renewed or extended shall be treated as part of the term of the original lease.... The provisions of this subparagraph do not allow as deductions from gross income amounts disallowed as deductions under other provisions of the Code, such as section 461 (relating to general rule for taxable year of deduction), section 465 (relating to deductions limited to amount at risk in case of certain activities), or section 704(d) (relating to limitation on allowance to partners of partnership losses).

T.D. 7523, 1978–1 C.B. 194. With adoption of the new version of the regulation, the IRS simultaneously issued Rev.Rul. 77–489, 1977–2 C.B. 144, in order to interpret the references to I.R.C. §§ 446 and 461, which first appeared in the final version of Treas.Reg. § 1.612–3(b)(3). The effect of these references was to disallow a current deduction for any amount attributable to periods extending beyond the close of the taxable year. Rev.Rul. 77–489 confirmed

this result by concluding that advanced minimum royalties were to be deducted not when paid or accrued, but rather in the year to which they were attributable. The amendment was retroactive to October 29, 1976. It is undisputed that plaintiffs relied on the language of the 1960 and proposed regulations in entering the sublease on August 1, 1977. Defendant asserts that plaintiffs also relied on the suspended revenue rulings, but that viewpoint amounts to argument. In any event, those revenue rulings have nothing to do with advanced minimum royalties.

Defendant makes four arguments in support of its motion for summary judgment. According to defendant, the partnership's deduction in 1977 for $3,448,920.96, or its alleged accrued liability for advanced minimum royalties corresponding to the years in issue (and, as a result, each plaintiff's distributive share), should be disallowed as inconsistent with the general principle that expenses are currently deductible as ordinary and necessary business expenses only to the extent that they relate to the year of the deduction. Secondly, defendant takes the position that this general principle recognized in *Burnet, Jamison Coal,* and *Russian Finance* implicitly was recognized in Treas.Reg. § 9.23(m)–10(e), as well as in its successor Treas.Reg. § 1.612–3(b)(3) and in the first proposal to amend section 1.612–3(b)(3), and, finally, was referred to specifically in the final version of section 1.612–3(b)(3) and Rev.Rul. 77–489 to reiterate its pervasiveness. Defendant's third contention is that the Commissioner did not abuse his discretion in applying the final version of Treas.Reg. § 1.612–3(b)(3) to Signal since the prior law and suspension of the two revenue rulings provided adequate notice as to the effect of the final version. The last contention is that the 1977 deduction must be disallowed because the partnership's payments were tendered neither in a substantially uniform manner nor annually as required by Treas.Reg. § 1.612–3(b)(3) and because the partnership did not accrue a liability for the full amount of the royalties during that year.

Plaintiffs argue broadly that Treas.Reg. § 1.612–3(b)(3), as finally adopted in 1977, changed the deductibility of advanced minimum royalties that had been entrenched for 37 years. From this premise plaintiffs further contend that the Commissioner abused his discretion in applying the new tax treatment of advanced minimum royalties to Signal because the partnership had entered into its sublease in reliance on the 1960 and proposed regulations and because it had not relied on either of the suspended revenue rulings. According to plaintiffs, a real issue exists whether the IRS had allowed deductions of advanced minimum royalties in the year in which liability for their payment accrued.

A discovery dispute arose when plaintiffs sought the IRS files for the gestation of Treas.Reg. § 1.612–3(b)(3) from the decision to amend through its adoption in final form. Defendant initially resisted discovery on the grounds of relevancy and executive privilege. Based on the assertion of privilege, the court ordered *in camera* inspection. After the documents had been produced and inspected, defendant withdrew the claim to privilege. On brief the parties alluded to but did not join issue on whether the amended regulation was interpretative or legislative; if the former, the discovery would have been disallowed. An order entered on January 8, 1986, concluded on a preliminary basis that the regulation was interpretative, *see Ward v. Commissioner,* 784 F.2d 1424, 1430 (9th Cir. 1986); *Redhouse v. Commissioner,* 728 F.2d 1249, 1253 (9th Cir.), *cert. denied,* 469 U.S. 1034, 105 S.Ct. 506, 83 L.Ed.2d 397 (1984).[2] In the meantime, under the broad discretion conferred by RUSCC 26(b)(1), the

---

**2.** Contrary to plaintiffs' argument, *Redhouse* did not say that the language added in 1977 to the proposed regulation was interpretative and that the regulation proposed in 1976 was legislative. The 1977 amendment, in its proposed and final form, was deemed interpretative because it re-

voked the two revenue rulings as erroneous interpretations of the 1960 regulation, which itself was legislative. In this court's view, the 1977 amendment did more and under *Redhouse's* approach would be considered legislative.

court ordered production of certain documents because of their obvious relevance to plaintiffs' complaint. These documents discuss the IRS' intention during the amending process to issue a revenue ruling along the lines of Rev.Rul. 77–489 to deal with what the IRS viewed as an accounting problem. In other words, the IRS always intended the amended regulation to have the effect that the language finally gave it (whether in a revenue ruling or in the regulation itself), although the language did not appear in the proposed regulation. The wisdom of hindsight commends that the issue regarding the nature of the regulation should have been briefed and resolved definitively before the documents were ordered released. Out of an abundance of caution, the released documents have not been considered in deciding the merits.

## DISCUSSION

1. *Deduction of Advanced Minimum Royalties Under Case Law Before First Regulation in 1940*

I.R.C. § 446(a) provides that "[t]axable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." Section 461(a) provides, in part, "The amount of any deduction ... shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income." Treas.Reg. § 1.461–1(a)(2) provides, in part, that under the "accrual method of accounting, an expense is deductible for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy." As a limitation to these general rules, Treas.Reg. § 1.461–1(a)(2) provides that "any expenditure which results in the creation of an asset having a useful life which extends substantially beyond the close of the taxable year may not be deductible, or may be deductible only in part, for the taxable year in which incurred...."

*Helvering v. Russian Finance & Construction Corp.,* 77 F.2d 324 (2d Cir.1935); *Commissioner v. Jamison Coal & Coke Co.,* 67 F.2d 342 (3d Cir.1933); and *Burnet v. Hutchinson Coal Co.,* 64 F.2d 275 (4th Cir.), *cert. denied,* 290 U.S. 652, 54 S.Ct. 69, 78 L.Ed. 565 (1933), are not inconsistent with the impact of sections 446 and 461 on the deductibility of advanced minimum royalty payments, but they do not reach the precise issue of law addressed by this case.

In *Burnet* the taxpayer agreed that during the year at issue, 1921, it would mine from leased property an estimated 350,000 tons of coal. If such quantity were not actually mined, then the taxpayer nevertheless was required to pay a minimum royalty corresponding to the estimate. During 1921 the taxpayer was able to mine only 134,621 tons of the 350,000-ton estimate. As agreed, the taxpayer paid a royalty on this shortage amounting to $16,154.62 and deducted this amount from its gross income on its 1921 tax return. *Jamison Coal* concerned tax years 1918 and 1920. In these years the taxpayer failed to remove coal equal to an estimate of 250,000 tons per year, but did pay minimum royalties corresponding to the mining estimate. Despite its inability to mine the entire 250,000 tons of coal in either 1918 or 1920, the taxpayer deducted its full minimum royalty payments as ordinary and necessary business expenses in these years.

In *Russian Finance* an accrual basis taxpayer entered into an agreement under which the taxpayer agreed to pay royalties annually on specified tonnages of ore to be exported, "and, in any event, to pay not less than $1,500,000 a year during the first two years." 77 F.2d at 326. The taxpayer did not export the minimum tonnage of ore, but, as agreed, paid the minimum royalty of $1,500,000 in both 1926 and 1927. The Second Circuit held that "[t]he minimum royalties paid by the taxpayer in 1926 and 1927, which were in excess of the royalties on the actual exports, are deductible in the years when paid." *Id.* at 328.

Each of these cases had a scenario in which the taxpayer tenders as a minimum

royalty only that amount attributable to a quantity of coal estimated as minable or ore capable of export in one year and seeks a deduction therefor. Although the amount of coal actually mined and ore actually exported in the particular year or years in issue did not correspond to the estimate, the deduction in each case was held to be permissible. Defendant correctly distinguishes the taxpayers in the three circuit court decisions from plaintiffs in this case. Plaintiffs seek a deduction for minimum royalties not in an amount attributable to one year, but rather in an amount attributable to five years. *Burnet, Jamison Coal,* and *Russian Finance* thus leave unresolved the issue of whether a taxpayer may take a current-year deduction for the payment of advanced minimum royalties or the accrual of a liability with respect thereto which is attributable to periods extending beyond the taxable year.

2. *Plain Meaning of Language in Treasury Regulations*

This case involves neither a challenge that a Treasury regulation is inconsistent with the statute from which it takes life, *see, e.g., Thomas International, Ltd. v. United States,* 773 F.2d 300 (Fed.Cir.1985), *cert. denied,* ——— U.S. ———, 106 S.Ct. 1261, 89 L.Ed.2d 571 (1986), nor the question whether a rule of long standing has been changed such that the IRS should be estopped from changing it retroactively.[3] *See, e.g., Helvering v. R.J. Reynolds Tobacco Co.,* 306 U.S. 110, 59 S.Ct. 423, 83

L.Ed. 536 (1939). What is involved is the claim that the Commissioner should not be allowed to apply the regulation as adopted to the partnership in this case because Signal relied to its detriment on the 1960 and proposed regulations, neither of which contained the later added and previously unpublished language limiting the partnership's ability to deduct a liability in the year it was accrued. Deference to Treasury regulations "[sets] the framework for judicial analysis; it does not displace it." *United States v. Cartwright,* 411 U.S. 546, 550, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973). The Treasury regulation before and after amendment is unambiguous and therefore its terms should be accorded their plain and obvious meaning. *Collums v. United States,* 480 F.Supp. 864, 869 (D.Wyo.1979) (citing *United States v. Western Pacific R.R.,* 385 F.2d 161, 163 (10th Cir.1967); *Christner v. Poudre Valley Cooperative Ass'n,* 235 F.2d 946, 950 (10th Cir.1956)).

The language involved in the incarnation of Treas.Reg. § 1.612-3(b)[4] as adopted by the IRS on January 20, 1960, is quoted again to facilitate analysis of subsequent changes and what they mean:

(1) If the owner of an operating interest in a mineral deposit ... is required to pay royalties on a specified number of units of such mineral ... annually whether or not extracted ... within the year, and may apply any amounts paid on account of units not extracted ..., within the year against the royalty on

---

**3.** Plaintiffs argued that such a change has taken place because the courts in *Burnet, Jamison Coal,* and *Russian Finance* allowed deductions of advanced minimum royalties on other than an annual basis and that the subsequent regulations codified this case law. Plaintiffs were forced to jettison *Burnet* and *Jamison Coal* for this legal point; and the court agrees with defendant's reading of *Russian Finance.* Through the discovery allowed to date and additional discovery that they would want to pursue, plaintiffs would attempt to show that the IRS practice under regulations since 1940, irrespective of the prior case law, was to allow deduction of advanced minimum royalties on a nonrecurring basis. The record, however, permits an inquiry that protects plaintiffs' rights without reference to the discovery that has taken place. Instead of focusing on an alleged change in the law, the

issue is whether the regulation as adopted, containing added language that the IRS did not publish before adoption, changed significantly from the regulation as proposed and the 1960 regulation then in effect.

**4.** The language in the 1960 version of Treas.Reg. § 1.612-3(b) had its genesis 20 years earlier in an amendment to Treas.Reg. § 9.23(m)-10(e). *See supra* pp. 49-50. Because of the substantial similarity between Treas.Reg. § 9.23(m)-10(e) and Treas.Reg. § 1.612-3(b)(3), reprinting the 1940 regulation is unnecessary. However, Treas.Reg. § 9.23(m)-10(e) is significant in that it represents the inception of the regulatory scheme related to the tax treatment of advanced royalties.

the mineral ... thereafter extracted ...,, the payee shall compute cost depletion on the number of units so paid for in advance of extraction ... and shall treat the amount so determined as an allowable deduction for depletion from the gross income of the year in which such payment or payments are made. No deduction for depletion by such payee shall be claimed or allowed in any subsequent year on account of the extraction ... in such year of any mineral ... so paid for in advance and for which ... [deduction has once been made].

\* \* \* \* \* \*

(3) The payor, at his option, may treat the advanced royalties so paid or accrued in connection with mineral property as follows:

(i) As deductions from gross income for the year the advanced royalties are paid or accrued, or

(ii) As deductions from gross income for the year the mineral product, in respect of which the advanced royalties were paid, is sold.

The Federal Register of November 2, 1976, announcing the proposal to amend Treas.Reg. § 1.612–3(b) stated that subparagraph 3 of the regulation was to be revised as follows:

(3) *The payor shall treat the advanced royalties so paid or accrued in connection with mineral property as deductions from gross income for the year the mineral product, in respect of which the advanced royalties were paid or accrued, is sold.* However, in the case of advanced royalties paid or accrued in connection with mineral property as a result of a minimum royalty provision, the payor, at his option, may instead treat the minimum royalty payments as deductions from gross income for the year in which the minimum royalties are paid or accrued. *For purposes of this paragraph, a minimum royalty provision requires that substantially uniform royalty payments be made at least annually over the life of the lease.* For an exception to this treatment when

the payor is a sublessor of coal or domestic iron ore, see paragraph (b)(3) of § 1.631–3. Every taxpayer who pays or accrues advanced royalties resulting from a minimum royalty provision must make an election as to the treatment of all such minimum royalties in his return for the first taxable year ending after December 31, 1939, in which such minimum royalties are paid or accrued. The taxpayer's treatment of such minimum royalties for such first year shall be deemed to be the exercise of the election. Accordingly, a failure to deduct such minimum royalties for that year will constitute an election to have all such minimum royalties treated as deductions for the year of the sale of the mineral product in respect of which such minimum royalties are paid or accrued.

41 Fed.Reg. 43,133–34 (1976) (underscored portions designate significant changes from the 1960 version). As finally adopted on December 14, 1977, Treas.Reg. § 1.612–3(b)(3) provides:

The payor shall treat the advanced royalties paid or accrued in connection with mineral property as deductions from gross income for the year the mineral product, in respect of which the advanced royalties were paid or accrued, is sold. *For purposes of the preceding sentence, in the case of mineral sold before production the mineral product is considered to be sold when the mineral is produced (i.e., when a mineral product first exists).* However, in the case of advanced mineral royalties paid or accrued in connection with mineral property as a result of a minimum royalty provision, the payor, at his option, may instead treat the advanced royalties as deductions from gross income for the year in which the advanced royalties are paid or accrued. *See section 446 (relating to general rule for methods of accounting) and the regulations thereunder.* For purposes of this paragraph, a minimum royalty provision requires that a substantially uniform amount of royalties be paid at least annually *either* over

the life of the lease *or for a period of at least 20 years, in the absence of mineral production requiring payment of aggregate royalties in a greater amount. For purpose of the preceding sentence, in the case of a lease which is subject to renewal or extension, the period for which it can be renewed or extended shall be treated as part of the term of the original lease.... The provisions of this subparagraph do not allow as deductions from gross income amounts disallowed as deductions under other provisions of the Code, such as section 461 (relating to general rule for taxable year of deduction), section 465 (relating to deductions limited to amount at risk in case of certain activities), or section 704(d) (relating to limitation on allowance to partners of partnership losses).*

T.D. 7523, 1978–1 C.B. 194 (underscored portions designate language added to proposed amendment).

The first reference to sections 446 and 461, the general rules regarding the capitalization of prepaid expenses, was not made until the adoption of the final amendment of Treas.Reg. § 1.612–3(b). From 1940 to adoption of the final amendment, the regulations relating to the tax treatment of advanced minimum royalties contained no reference to these general rules. The plain meaning of the regulation before final amendment was that a taxpayer who paid a minimum royalty or accrued a liability with respect thereto that exceeded an amount attributable to an annual period nevertheless could deduct from gross income such payment or accrued liability in its entirety.[5] This interpretation is reinforced by the addition of language in the regulation as adopted in 1977 that effec-

tively eliminates the term "accrued." Although liability for annual payments may be accrued in year one, the added language requires deduction of the annual payments in the year to which they are attributable. This has the effect of requiring the deductions to correspond to the payments that must be made annually and thereby eliminates the option to deduct the liability when accrued. The tortured language of the regulation as adopted thus gives the taxpayer an option to deduct advanced minimum royalty payments from gross income for the year in which the liability for the royalties is accrued unless the taxpayer makes annual payments, as he must to qualify for advanced minimum royalty treatment in the first place. Obviously, the meaning of the 1960 and proposed regulations was changed in the regulation as adopted.

The case law applicable to section 461 as it existed prior to the enactment of the Tax Equity and Fiscal Responsibility Act, Pub.L. No. 98–369, 98 Stat. 598, 607 (1984) (codified in scattered sections of 26 U.S.C.) (the "TEFRA"), supports an interpretation of the 1960 and proposed regulations consistent with the notion that a current-year deduction formerly was permitted with respect to amounts attributable to periods extending beyond the taxable year.[6] *See Kaiser Steel Corp. v. United States,* 717 F.2d 1304, 1307–08 (9th Cir.1983) (entire amount placed in reserve to meet worker's compensation liability deductible because all events bearing on fact of liability occurred and amount of liability determinable with reasonable accuracy); *Ohio River Collieries Co. v. Commissioner,* 77 T.C. 1369, 1377 (1981) (future cost of restoring stripmined land accruable and deductible if

---

5. *Vastola v. Comm'r,* 84 T.C. 969, 976 (1985), avoided rendering "the 'paid or accrued' language mere surplusage" by interpreting it "to include a royalty provision that requires an *accrual* of royalty obligations at least annually." (Emphasis in original; citation omitted.)

6. The addition of I.R.C. § 461(h)(1), section 91(a) of the TEFRA, precludes an accrual basis taxpayer from meeting the "all events" test prior to the completion of economic performance.

*See* Research Institute of America, Inc., *The RIA Complete Analysis of the Tax Reform Act of 1984* ¶ 1205 (1984). I.R.C. § 461(h)(1) provides:

For purposes of this title, in determining whether an amount has been incurred with respect to any item during any taxable year, the all events test shall not be treated as met any earlier than when economic performance with respect to such item occurs.

amount can be determined with reasonable accuracy); *Harrold v. Commissioner*, 192 F.2d 1002 (4th Cir.1951) (same).

Defendant contends that despite the absence of language in the 1960 and proposed regulations concerning the rules relating to capitalization, their application should be presumed. According to defendant, the presumption can be rebutted only by an unequivocal showing against applying them. *Keller v. Commissioner*, 725 F.2d 1173, (8th Cir.1984), is relied on for this proposition, but the underlying legislative history was examined in *Keller* to divine a legislative purpose that immediate deduction of prepaid intangible costs "would not necessarily achieve the result Congress sought." 725 F.2d at 1179. Defendant does not go into legislative history here.

Several courts and commentators, however, have concluded that Treas.Reg. § 1.612–3(b)(3) in its final form was substantially similar to the law as it had existed since the inception of the regulatory scheme or that the changes from the proposed to final amendments were minor. *See Seaman v. Commissioner*, 84 T.C. 564, 587–88 (1985); *Redhouse v. Commissioner*, 728 F.2d at 1250; *Wing v. Commissioner*, 81 T.C. 17, 35 (1983); *Wendland v. Commissioner*, 79 T.C. 355, 379 (1982), *aff'd*, 739 F.2d 580 (11th Cir.1984); *see also* P. Maxfield, *Taxation of Mining Operations* § 3.03[3][a], at 3–31 (1983). According to *Wendland*, the IRS took the position in that litigation that the 1960 regulation dealt only with minimum annual royalty payments. 79 T.C. 384–85 & nn. 16 & 17. (This view apparently was not shared by tax practitioners. *See Pomerance, Coal-leasing arrangements offer substantial tax-shelter benefits*, 44 J. Tax'n 350 (1976); 44 J. Tax'n 381 (1976).) Deemed error by the IRS leading to the amendment of Treas.Reg. § 1.612–3(b)(3) was the treatment by Rev.Rul. 70–20 and 74–214 of advanced royalties as advanced minimum royalties when the 1960 regulation did not support this result. *See* G.C.M. 36,573 at 9. *Seaman* bases its analysis, to some extent, on its reading that Rev.Rul. 74–214 dealt with lump-sum payments of advanced minimum royalties. The other cases cited did not address the precise argument plaintiffs make with respect to the plain meaning of the 1960 and proposed regulations, because these cases did not involve advanced minimum royalties and the taxpayers in each had relied on an interpretation of the 1960 and proposed regulations consistent with Rev.Rul. 74–214.

### 3. *Abuse of Discretion*

Under 26 U.S.C. § 7805(b), "the Secretary [of the Treasury] . . . or his delegate may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect." Thus, the provision establishes a presumption that regulations are to be applied retroactively. *See, e.g., CWT Farms, Inc. v. Commissioner*, 755 F.2d 790, 802 (11th Cir.1985); *Manocchio v. Commissioner*, 710 F.2d 1400, 1403 (9th Cir.1983). The absence of language specifically according retroactive effect to a regulation is not a bar to its application in this manner. *See, e.g., Anderson, Clayton & Co. v. United States*, 562 F.2d 972, 979 (5th Cir.1977), *cert. denied*, 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785 (1978).

The Commissioner, however, " 'does not have [a] *carte blanche* [in applying a regulation retroactively]' "; " '[H]is choice must be a rational one, supported by relevant considerations.' " *Chock Full O' Nuts Corp. v. United States*, 453 F.2d 300, 302 (2d Cir.1971) (quoting *International Business Machines v. United States*, 170 Ct.Cl. 357, 367, 343 F.2d 914, 920 (1965), *cert. denied*, 382 U.S. 1028, 86 S.Ct. 647, 15 L.Ed.2d 540 (1966) (emphasis in original)). The determination that a regulation shall be applied retroactively is subject to review for abuse of discretion. *See, e.g., Redhouse v. Commissioner*, 728 F.2d at 1251; *Wendland v. Commissioner*, 739 F.2d 580, 581 (11th Cir.1984). "[I]n each case the reviewing court must determine whether under all the circumstances, retroactive application is warranted." *Baker v. United States*, 748 F.2d 1465, 1467 (11th Cir.1984)

(citing *Chock Full O'Nuts Corp.*, 453 F.2d at 302–03).

■ The Commissioner abuses his discretion in applying a regulation retroactively if: (1) it would be "unduly harsh" upon, *Redhouse*, 728 F.2d at 1252, or cause "inordinate harm" to, *CWT Farms*, 755 F.2d at 802, a particular taxpayer; (2) such application alters settled prior law or policy implicitly approved by Congress, *Helvering v. R.J. Reynolds Tobacco Co.*, 306 U.S. at 116–17, 59 S.Ct. at 426–27, and justifiably relied upon by taxpayers, *CWT Farms*, 755 F.2d at 802; *see also Elkins v. Commissioner*, 81 T.C. 669, 681 (1983); or (3) it would result in inequality of treatment between two similarly situated taxpayers. *Automobile Club v. Commissioner*, 353 U.S. 180, 184, 77 S.Ct. 707, 710, 1 L.Ed.2d 746 (1957).

Defendant argues that even if there were some inconsistency between the final amendment and prior law, the Commissioner "was free to change his legal position with retroactive effect." Def's Br. filed Apr. 3, 1986, at 3. Relying upon *National Muffler Dealers Ass'n v. United States*, 440 U.S. 472, 484 n. 19, 99 S.Ct. 1304, 1310 n. 19, 59 L.Ed.2d 519 (1979), defendant urges the proposition that the Commissioner has broad authority to issue and interpret Treasury regulations. Even so, the Commissioner's broad authority is constrained by the standards related to abuse of discretion.

*Redhouse* and *Wendland* say that if the prior law supplies notice of the change effected in the subsequent promulgation, the taxpayer sustains no harm. The existence of notice militates against a determination that there has been an abuse of discretion. 728 F.2d at 1252; 79 T.C. at 382–83.

Rev.Rul. 70–20 and 74–214 were intended to interpret the manner of payment deemed acceptable under Treas.Reg. § 1.612–3(b)(3), as amended in 1960. Rev.Rul. 70–20 permitted a current year deduction to a mining taxpayer who was operating under a sublease that required payment via nine installments. Rev.Rul. 74–214 interpreted the regulation as permissive of a current deduction for a single lump-sum payment tendered at the inception of the mining lease. In effect, the rulings were according the tax treatment related to advanced minimum royalties to taxpayers whose payments were in the nature of an advanced royalty or bonus.

News Release IR–1687 announced that Rev.Rul. 70–20 and 74–214 were to be suspended by a forthcoming proposal to amend Treas.Reg. § 1.612–3(b)(3). Taxpayers were not to "rely on the tax treatment provided in these [r]ulings *on or* after October 29, 1976." IR–1687 at 2 (emphasis in original). The release further stated that "[t]he amendment would affect the year of deductibility of advanced royalties." *Id.* at 1. The proposed amendment to Treas.Reg. § 1.612–3(b)(3), corresponding to the suspension of Rev.Rul. 70–20 and 74–214, affected the year of deductibility for advanced royalties by stating: "The payor shall treat the advanced royalties so paid or accrued in connection with mineral property as deductions from gross income for the year the mineral product, in respect of which the advanced royalties were paid or accrued, is sold...." 41 Fed.Reg. 48,133–34. Also, the proposed amendment continued to permit a deduction for advanced minimum royalties in the year paid or accrued, but tied the availability of the deduction to "substantially uniform royalty payments ... made at least annually over the life of the lease." *Id.* 48,134. The proposed amendment contained neither references to sections 446 and 461 nor notice that the sections would appear in the final amendment of 1977.

On December 14, 1977, 13 months after the announcement of the proposed amendment, the final amendment issued containing references to sections 446 and 461. After the issuance of Rev.Rul. 77–489, it was clear that the references to sections 446 and 461 in the final version of Treas. Reg. § 1.612–3(b)(3) foreclosed a current deduction for any amount attributable to periods extending beyond the close of the taxable year.

On August 1, 1977, when Signal entered into the sublease agreement, the 1960 regulation was in effect, Rev.Rul. 70–20 and 74–214 had been suspended, and there existed a proposal to amend Treas.Reg. § 1.612–3(b)(3). As of the date of the sublease agreement, the language of the 1960 and proposed regulations permitting the deduction of advanced minimum royalties in the year paid or accrued was the same. As a result of the suspension of Rev.Rul. 70–20 and 74–214 and the announcement of the proposed amendment, the partnership had notice that a deduction for royalties tendered in the form of a lump sum or an installment was no longer available in the year such royalty was paid or a liability accrued with respect thereto. For the first time the IRS provided express notice of the distinction between the tax treatment for advanced royalties and advanced minimum royalties. Notwithstanding the significance of these changes for which notice was provided, the partnership received no notice of any change in the availability of a deduction for payment made or a liability accrued pursuant to a minimum royalty provision.

In *Redhouse* the Ninth Circuit confirmed that the revocation of Rev.Ruls. 70–20 and 74–214 and the incorporation into the final amendment of the language of the proposed regulation concerning the requirement of substantially uniform payments only illustrated the manner of payment required under a minimum royalty provision. "[T]he 1977 amendment to the regulation revoked the construction that the 1974 revenue ruling [74–214] gave to the 1960 amended regulation and returned to the intent of the 1960 amended regulation (as well as earlier versions) that payments be made on an annual basis...." 728 F.2d at 1252. Thus, *Redhouse* recognized that payment made on an annual basis as a requirement for a current deduction. The IRS had a similar interpretation of the revocation of Rev Rul. 70–20 and 74–214. "The lump sum and installment payments involved in these rulings are ... considerably different from minimum annual royalty payments and should not be available for

deduction under the option provided for in Treas.Reg. § 1.612–3(b)(3)." G.C.M. 36,573 at 9.

■ The plain meaning of the language of Treas.Reg. § 1.612–3(b)(3) as it existed in the 1960 and proposed regulations on August 1, 1977, authorized the deduction in 1977. Because neither the suspension of Rev.Rul. 70–20 and 74–214 nor the proposed regulation published on November 2, 1976, gave notice that a change was going to be made affecting the option to deduct advanced minimum royalties when paid or accrued, the partnership would sustain "inordinate harm" if it were forced to comply with the final amendment to Treas.Reg. § 1.612–3(b)(3), as adopted on December 14, 1977, or the interpretation of the regulation under Rev.Rul. 77–489. It is concluded, therefore, that the Secretary abused his discretion by failing to provide the partnership "adequate guidance as to the extent to which his power ... [would] be exercised, or at the very least to avoid misleading them." *Elkins v. Commissioner*, 81 T.C. 669, 681 (1983) (abuse of discretion regarding change in the effective date of provisions of Treas.Reg. § 1.612–3(b)(3) after announcement in the News Release and Federal Register). However, because "plaintiffs deliberately negotiated and entered into their Sublease in reliance upon the requirements of the ... [proposed regulation], in that the Sublease required substantially uniform payments annually over the life of the lease....", Plfs' Br. filed Mar. 5, 1986, at 48; Plfs' Proposed Finding 10, the Commissioner did not abuse his discretion in applying to the partnership these requirements of the amended regulation.

The question now becomes whether the partnership paid royalties pursuant to a minimum royalty provision. If the provision qualifies under Treas.Reg. § 1.612–3(b)(3), the partnership is not barred by the 1977 amendment from deducting in 1977 the full accrued liability for the advance minimum royalty.

### 4. *Minimum Royalty Provision*

▮ Defendant contends that royalties were not paid or accrued by the partnership pursuant to a "minimum royalty provision" within the meaning of Treas.Reg. § 1.612–3(b)(3), as amended. A minimum royalty provision under the regulation "requires that a substantially uniform amount of royalties be paid at least annually either over the life of the lease or for a period of at least 20 years, in the absence of mineral production requiring payment of aggregate royalties in a greater amount." Almost identical language, "substantially uniform royalty payments be made at least annually over the life of the lease," appeared in the proposed regulation, so that Signal had notice of the requirement nine months before entering its sublease. Defendant makes two arguments that the partnership's payments qualify for minimum royalty treatment.

First, because the sublease provides a schedule of royalties ranging from $1,417,-000 to $500,000 (although the sublease was permissive of payments in amounts varying between $500,000 and $1,000,000), defendant asserts that the required payments were not substantially uniform in amount. Secondly, defendant finds objectionable that the sublease required payment of $1,417,000 in 1977, yet allowed the partnership to satisfy its obligation by paying $1,000,000 in cash in 1977, while paying the remainder by a non-negotiable nonrecourse promissory note in the amount of $417,000, plus interest, "which the sublease Agreement stated 'need not be paid until April 15, 1978.'" Def's Br. filed Feb. 4, 1986, at 16. The nonrecourse nature of the note, defendant says, is inconsistent with the annual payment requirement and imposes on Signal only an illusory obligation because payments are contingent on production.

### a. *The Substantial Uniformity Requirement*

Signal's sublease does not require royalties in an amount greater than mineral production. Therefore, the sublease must provide for substantially uniform payments if the payments are to qualify as made pursuant to a minimum royalty provision. Rev.Rul. 81–299, 1981–2 C.B. 138, 139, says that the requirement "is intended to discourage arrangements that result in large aggregated payments designed to give rise to disproportionately large deductions in the early years of the lease...."

Defendant relies on Rev.Rul. 79–381, 1979–2 C.B. 244, to support its argument that the payments were not substantially uniform. The taxpayer in Rev.Rul. 79–381 was required to pay 450x dollars in 1976 upon the execution of a mining lease. The lease contained no schedule of payments for subsequent years, stating only that "[i]n each subsequent year, the partnership was to pay as a minimum advanced [royalty] ... an amount equal to 75 percent of the average of the previous [three] years production times z dollars royalty...." The IRS determined that the formula for calculating subsequent year payments was inconsistent with the notion of substantially uniform payments:

> The required minimum payment is based on the average of the prior years' coal production. If no coal was mined in the prior years used in the formula, no advanced payment would be due. Subsequent production could vary so substantially that payments based on any moving average would not result in uniformity.

1979–1 C.B. 245. Accordingly, Rev.Rul. 79–381 held that the payments failed to satisfy the minimum royalty provision of Treas.Reg. § 1.612–3(b)(3).

Plaintiffs correctly point out that Signal's sublease included a strict payment schedule requiring annual payments in specified amounts. Because the lease in Rev.Rul. 79–381 utilized a formula for determining payment, the amount of payment could not be determined until the year it was due. In this case the amount of pay-

ment required for each year was determined upon execution of the sublease.[7]

Based upon the schedule set forth in section 7(a), defendant also contends that the disparity in payments between $1,417,000 and $500,000 required by the sublease represents a $917,000 difference between the highest and lowest payments. A deviation of this magnitude, according to defendant, is inconsistent with substantial uniformity. Plaintiffs respond that another part of section 7(a) governs for purposes of determining whether the payments were consistent with the substantial uniformity requirement. Section 7(a) states in pertinent part that "$1,000,000 of the $1,417,000 minimum royalty due in the first year [1977] shall be paid upon the signing of this lease. The remaining $417,000 shall be due upon the signing of this lease, but need not be paid until April 15, 1978...." From this language plaintiffs argue that because only $1,000,000 was required to be paid in 1977, the range of payments under the schedule of payments was between $1,000,000 and $500,000.

In the first two years, the partnership paid $1,000,000, and $917,000, respectively, which total 56 percent of the royalty payments. The other three annual payments were each $500,000. Assuming that plaintiffs are correct that the provision governing how royalty payments are to be made should be the gauge for substantial uniformity, the disparity of payments is still $500,000 (between $1,000,000 and $500,000). Plaintiffs then argue that the proposed and final regulations did not define substantial uniformity, so that a $500,000 disparity does not disqualify the payments. To support their position, plaintiffs cite *Aven v. United States*, 78–2 T.C. 9729 (D.Okla.1978). The taxpayers in *Aven* were limited partners in Resource Analysis and Management Group B, a limited partner of North Block Gas, Ltd. ("North Block"). North Block entered into a mineral lease under which it was obligated to pay the lessor

> [a]s consideration for the assignment of the leases, ... $50.00 times the net mineral acres acquired. On the first and second anniversaries of the effective date of the agreement, North Block was to pay $12.50 times the number of net mineral acres acquired, and on the third and subsequent anniversaries, North Block was to pay $3.00 times the net mineral acres acquired....

*Id.* North Block acquired 45,427 net mineral acres and was therefore required to pay an initial lump sum of $2,271,350 and annual payments which varied between $567,837.50 and $136,281. The disparity between the high and low prices was $431,556.50. *Aven* permitted the deduction holding that the payments constituted advanced minimum royalties under Treas. Reg. § 1.612–3(b)(3). However, *Aven* does not reach the issue of substantial uniformity, because the Tax Court applied the 1960 version of Treas.Reg. § 1.612–3(b)(3), which did not include the requirement of substantially uniform payments. In any event, *Aven* is not authority that payments varying by over $60,000 than the discrepancy in that case can be called substantially uniform.

In opposition to defendant's motion for summary judgment on the ground that the payments between $1,417,000 and $500,000 were not substantially uniform, plaintiffs put forward as a genuine issue of material fact the sublease provision governing the manner of payments. However, no disputed factual issue was raised that the

---

7. In Rev.Rul. 81–299, 1981–2 C.B. 139, the IRS took the position that the payment formula in the lease entered into by the taxpayer in Rev. Rul. 79–381 was objectionable because it enabled the taxpayer to control whether or not an annual payment would be made in a given year. At the very least, it allowed the taxpayer to control the extent of those payments. The IRS agreed that because the lessee controlled the amount of payments the taxpayer was not operating pursuant to a minimum royalty provision. Again, in this case, the sublease specified the payment schedule to which the partnership was to adhere. The sublease contained no provision which would have permitted the partnership to deviate from the established schedule. Thus, unlike the taxpayer in Rev.Rul. 79–381, Signal upon execution of the sublease had no control over its payment requirements.

manner of payments effected a range of payments between $1,000,000 and $500,000. See Plfs' Proposed Finding 10.

Determining what are substantially uniform payments is not as difficult as plaintiffs argue. The Tax Court did not hesitate to characterize such payments as "uniform." *See Cheng v. Commissioner,* Tax Ct. Memo (P–H) ¶ 86,153, at 86,669 (Apr. 17, 1986). Plaintiffs said that they "deliberately negotiated" the sublease in view of the requirement for uniform payments, Plfs' Br. filed Mar. 5, 1986. They cannot benefit from the plain meaning of the regulation, as they did with respect to the term "accrued," and escape the plain meaning of another term like "substantially uniform." Assuming, *arguendo,* that the manner of payments, not the schedule of royalties, is determinative of substantial uniformity, a range of payments from $1,000,000 to $500,000 is not substantially uniform.

b. *The Annual Payment Requirement*

In *Wing v. Commissioner,* 81 T.C. 17, the Tax Court stated that inherent in the definition of a minimum royalty provision is the concept of an enforceable requirement that payment be made. 81 T.C. at 38 n. 30. Treas.Reg. § 1.612–3(b)(3) also provides that such a payment must be tendered annually. Defendant cites *Capek v. Commissioner,* 86 T.C. 14 (1986); *Oneal v. Commissioner,* 84 T.C. 1235 (1985); *Vastola v. Commissioner,* 84 T.C. 969 (1985); *Maddrix v. Commissioner,* 83 T.C. 613, 620–26 (1984), *aff'd,* 780 F.2d 946 (11th Cir.1986); and *Wing v. Commissioner,* 81 T.C. at 40–41, for the proposition that the annual payment required by Treas.Reg. § 1.612–3(b)(3) is not satisfied by a taxpayer who issues a nonrecourse promissory note in one year which is payable in a subsequent year. Plaintiffs seek to distinguish these cases on the ground that those leases permitted the taxpayers to satisfy their individual royalty obligations by an initial transfer of cash representing a part of the required royalty and by delivering a nonrecourse note payable in a future year to satisfy the remainder of the obligation.

Such leases, plaintiffs contend, did not require annual payments.

In *Capek* the taxpayers argued that the annual payment requirement of Treas.Reg. § 1.612–3(b)(3) was satisfied because the leases all required the payment of equal annual installments over the terms of their five-year leases. Quoting the Commissioner's response, the Tax Court said: "[E]ven if the transactional documents purport to require the taxpayers to pay a 'substantially uniform amount of royalties ... over the life of the lease,' the facts demonstrate that in practice there was no such requirement." 86 T.C. at 43. None of the taxpayers in *Capek* paid royalties in all years. "The most that any of the investors paid was one-fourth of the required royalty, and they paid such amounts in only some years ...." *Id.* For amounts not paid in cash, the taxpayers issued both recourse and nonrecourse promissory notes. In certain years investors were afforded the option of paying no cash and tendering a nonrecourse note for the full amount of the royalty.

The Tax Court in *Capek* concluded that the leases at issue were similar to the lease in *Oneal* because they did not require an annual cash payment. Under the circumstances *Capek* deferred to the holding in *Oneal:*

> Irrespective of the likelihood of the eventual satisfaction of such notes, the "addendum to mining lease" permitted deferral of the minimum annual royalties provided for in the "mining lease" so that payment was not required to be made at least annually. Consequently, the "payments" made by petitioners ... were not made pursuant to a valid "minimum royalty provision" in accordance with valid section 1.612–3(b)(3), Income Tax Regs.

86 T.C. at 46 (quoting *Oneal,* 84 T.C. at 1241).

The decision in *Oneal* confirmed the holdings in *Vastola, Maddrix,* and *Wing* on this issue. *Oneal* states that in these cases, as well as others, the "taxpayer transferred some cash and signed a nonre-

course promissory note in the balance amount payable generally in ten years." *Oneal*, 84 T.C. at 1241. In each of these decisions, the IRS argued successfully that by executing nonrecourse notes, the respective taxpayers deferred the balance of their royalties to subsequent years and thereby failed to make payments annually in compliance with Treas.Reg. § 1.612–3(b)(3). *Id.*

The terms of section 7(a) of the partnership's sublease differ significantly from the analogous provisions in the leases in *Capek, Oneal, Vastola, Maddrix,* and *Wing.* Section 7(a) requires annual payments, and they were made. Unlike the promissory notes in defendant's cited cases, the partnership's nonrecourse notes do not defer required payments until subsequent years, such that the partnership could avoid its royalty obligation in any one year. Contrary to that which the Tax Court found objectionable in *Capek,* the partnership here satisfied the payment obligations set forth in section 7(a). Under the circumstances the sublease provision specifying the manner of payments satisfies the annual payment requirement of Treas.Reg. § 1.612–3(b)(3).

### c. *The Accrued Liability Requirement*

Defendant finally argues that the partnership did not accrue a liability for advanced minimum royalties. The sublease Signal entered into in 1977 in the amount of $3,417,000 does represent an accrued liability. The notes plaintiffs issued to satisfy the debt did not render the obligation illusory simply because they were nonrecourse notes. The nonrecourse notes in *Ward v. Commissioner,* 784 F.2d at 1428; *Maddrix v. Commissioner,* 83 T.C. at 617; and *Wing v. Commissioner,* 81 T.C. at 20, were held illusory because they were secured only by the mineral interest in question. Although the nonrecourse notes in this case recited the obligation of the sublease to satisfy payment, the sublease provided in section 7(a) that the subleasee, *i.e.,* Signal, was absolutely liable for the amount. Signal is a limited partnership

and General Coal is a corporation, each with inherently limited exposure. Moreover, an accrued liability does not mean that the sublessor must be able to sue on it immediately, irrespective of a payment schedule, as defendant contends.

### CONCLUSION

Because the payments made were not substantially uniform, the partnership did not make its payments pursuant to a minimum royalty provision. As a result, the partnership cannot take a deduction for advanced minimum royalties in the year accrued. Based on the foregoing, defendant's motion for summary judgment is granted. The Clerk of the Court shall dismiss plaintiffs' complaint.

IT IS SO ORDERED.

No costs.